# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 93-97 (BAH) |
| ANTONE WHITE, *et al.*, | Chief Judge Beryl A. Howell |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Defendants Antone White and Eric Hicks were sentenced, in 1994, to life in prison for their leadership roles in the First Street Crew, a crack cocaine trafficking organization that operated around First and Thomas Streets in Northwest Washington, DC, from 1988 until the defendants' arrests in 1993. *United States v. White*, 116 F.3d 903, 909 (D.C. Cir. 1997) ("*White I*"). In 2019, after serving roughly twenty five years of their sentences, defendants moved for sentence reductions under Section 404 of the First Step Act of 2018 ("First Step Act"), Pub. L. 115-391, 132 Stat. 5194, which allows courts to impose a reduced sentence "as if" the reduced crack cocaine penalties established by Sections 2 and 3 of the Fair Sentencing Act of 2010 ("FSA"), Pub. L. 111-220, 124 Stat. 2372, had been in effect "at the time of the commission of the offense, not at the time of the original sentencing," *Concepcion v. United States*, 142 S. Ct. 2389, 2402 (2022); *id*. at n.6. This Court determined that both defendants were "eligible for relief under Section 404," but nonetheless that relief was not "available" due to the actual quantity of illegal narcotics found by the sentencing judge to have been involved in their offense conduct, which quantity would have continued to support a life sentence under both the current version of at least one of their statutes of conviction and the current applicable Guideline sentencing range, and because of the violence associated with their Crew's activities. *United*

States v. White, 413 F. Supp. 3d 15, 30, 50–51 (D.D.C. 2019) ("*White-2019*").  On appeal, the

D.C. Circuit rejected this Court's construction of the First Step Act, concluding that the statute

included "no additional 'availability' requirement" for relief to be granted, and remanded to this

Court to "weigh[] the factors listed in 18 U.S.C. § 3553(a)" and "the mitigating factors raised by

[defendants]," including their "post-sentencing conduct," before deciding whether to grant or

deny the requested relief.  *United States v. White*, 984 F.3d 76, 81 (D.C. Cir. 2020) ("*White II*").

In short, contrary to this Court's prior holding, relief could be granted to defendants under the

First Step Act.

On remand, defendants filed supplemental motions for relief under Section 404, *see* Def.

Hicks's Suppl. Mot. Imposition of a Reduced Sentence Under Section 404 of the First Step Act

("Hicks Mot."), ECF No. 731; Def. White's Suppl. Mot. Imposition of a Reduced Sentence

Under Section 404 of the First Step Act ("White Mot."), ECF No. 736, to which the government

filed responses in opposition, Gov't's Opp'n Def.'s Suppl. Mot. Under Section 404 of the First

Step Act ("Gov't's Hicks Opp'n"), ECF No. 744; Gov't's Opp'n Def.'s Suppl. Mot. Under

Section 404 of the First Step Act ("Gov't's White Opp'n"), ECF No. 745.  While agreeing that

defendants are eligible for relief under the First Step Act, the parties disagree only whether the

Court ought to exercise discretion to reduce defendants' sentences, applying the factors set out in

18 U.S.C. § 3553(a).  For the reasons set forth below, both defendants' motions are granted in

part and denied in part.  White's sentence is reduced to 35 years' imprisonment and Hicks's

sentence is reduced to 33 years' imprisonment, but the motions are otherwise denied. [1]

---

[1]      This case was directly reassigned to the undersigned Chief Judge in December 2016, Min. Entry (Dec. 8, 2016), in accordance with the then-effective Local Rules, which provided for the Chief Judge to "dispose of matters requiring immediate action in criminal cases already assigned to any judge of the Court if that judge is unavailable or otherwise unable to hear the matters."  D.D.C. LCrR 57.14(6).  The Local Rules now provide that "[r]eassignment of any criminal case, and matters arising therefrom, previously assigned to a judge who no longer sits on the district court shall be made by random assignment."  LCrR 57.13(b) (amended Nov. 9, 2017).

## I.      BACKGROUND

The factual and procedural background of this case has been described in detail in the previous opinions from this Court and the D.C. Circuit regarding defendants' motions under Section 404 of the First Step Act, *see White-2019*, 413 F. Supp. 3d at 18–26; *White II*, 984 F.3d at 82–85, and in the D.C. Circuit's earlier opinion affirming defendants' convictions on direct appeal, *see White I*, 116 F.3d at 909–911.  The background below offers a condensed overview of the relevant facts and procedural history for consideration of defendants' renewed motions on remand.

### A.   Factual Background

Defendants were leaders of the First Street Crew, "which, from early 1988 until the defendants' arrests approximately five years later, sold crack cocaine and engaged in 'violent activities'" across the Bloomingdale neighborhood in northwest Washington, D.C.  *White-2019*, 413 F. Supp. 3d at 18 (quoting *White I*, 116 F.3d at 909–11).  White "orchestrated the group's activities," and, after starting with small amounts of crack, quickly "became a wholesale supplier, selling 'weight,' . . . and fronting his cohorts smaller amounts of cocaine to sell for him." *White I*, 116 F.3d at 909.  Meanwhile, Hicks worked with White as a member of the Crew, and "eventually 'took charge when . . . White was "out of the neighborhood," *i.e.*, in prison.'"  *White-2019*, 413 F. Supp. 3d at 19 (quoting *White I*, 116 F.3d at 909, alteration in original).  Together with their fellow Crew members—many of whom, like defendants, were in their teens and early twenties—White and Hicks "controlled much of the distribution of crack" in the area around First and Thomas Streets, N.W.  Def. White's Presentence Investigation Report ("White PSR") ¶ 19, ECF No. 633-1. [2]  In the early years of the conspiracy, "the Crew cooked,

---

[2]      The relevant PSRs are docketed under seal but are unsealed to the extent referenced in this Memorandum Opinion to explain the Court's reasoning.  *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009).

cut and packaged its crack together" in both defendants' residences, employing Hicks's uncle "as a cooker."  Def. Hicks's Presentence Investigation Report ("Hicks PSR") ¶ 23, ECF No. 713. The total volume of crack cocaine for which defendants and their Crew were responsible, over the five-year conspiracy, was "conservative[ly] estimate[d]" to be at least 21 kilograms.  White PSR ¶ 41.

The First Street Crew used severe and sometimes fatal violence to maintain and enable its drug trafficking activities.  For instance, in "the summer of 1988 or 1989," White and other Crew members chased and assaulted a woman they suspected had taken crack cocaine from White's stash, handcuffing her to a tree and beating her with a baseball bat.  *Id.* ¶ 63.  White also threatened to kill others he believed were stealing from the First Street Crew, *id.* ¶ 66, and engaged in violence against rival gangs, *id* ¶¶ 64–65.  After law enforcement began investigating the Crew, "'ample evidence' showed that on October 6, 1992, 'White and [co-defendant Ronald] Hughes murdered' Arvell Williams, an acquaintance of White," *White-2019*, 413 F. Supp. 3d at 19 (quoting *White I*, 116 F.3d at 909, 916), who had volunteered to act as a confidential informant in the United States Attorney's investigation of the First Street Crew and had facilitated several crack purchases by an undercover officer, *White I*, 116 F.3d at 909.  After Williams was shot in broad daylight "sixteen times at close range," several witnesses identified White as one of the victim's shooters.  *Id*.  At trial, witnesses testified as to "a conversation between White and [his co-defendant] Hughes in which one of them said 'We killed the motherfucker,'" and that "White had told him 'We took care of Williams.'"  *White-2019*, 413 F. Supp. 3d at 19 (alterations omitted) (quoting *White I*, 116 F.3d at 916).  White further obstructed justice by warning another witness against cooperating with the government.  White PSR ¶ 82.

According to his presentence investigation report, Hicks played an integral role in

procuring, distributing, and selling crack cocaine throughout the course of the conspiracy, Hicks

PSR ¶¶ 16–24, and repeatedly possessed a firearm during actions taken in furtherance of the drug

trafficking, *id.* ¶¶ 52, 58.  He played a key role in the crack pipeline, "obtain[ing] wholesale

quantities of drugs and provid[ing] [those] drugs to lower-level members of the organization for

redistribution."  *Id.* ¶ 76.  He also obstructed justice by bribing a Grand Jury witness not to

disclose information to the Grand Jury about the Crew's violent activities, *id.* ¶ 69, and by

attempting to evade arrest by fleeing from police officers "in his Volvo station wagon . . . at 80–

90 miles per hour" at peak rush hour, "speeding through several red lights, . . . and crashing into

four cars," *id.* ¶ 71.  On one occasion, Hicks assaulted a person who owed the Crew money for

drugs with a broken bottle, "nearly sever[ing]" the person's ear.  *Id.* ¶ 67.

### B.   Procedural History

The Crew's operations continued until the defendants were indicted in March 1993.

*White I*, 116 F.3d at 909.  Along with three other co-defendants,[3] White and Hicks were charged

in a 26-count indictment with numerous crack distribution and conspiracy offenses for their roles

---

[3]       Defendants' three co-defendants all have completed their sentences.  First, co-defendant Ronald L. Hughes,
who was originally sentenced to life in prison on Count 1 and concurrent terms of 20 years for distribution of a
detectable amount of crack cocaine on Counts 9, 12, and 13, *White-2019*, 413 F. Supp. 3d at 27, had his sentence
reduced, in 2000, to 30 years' imprisonment, due to Guidelines amendments, *id.* at 28, allowing his release from
prison in May 2019, *id.* at 19 n.1.  On June 24, 2020, he was granted early termination of supervised release, with
the government's consent.  *See* Mem. & Order, *United States v. Hughes*, No. 93-cr-97-4 (BAH), ECF No. 727.
Second, co-defendant Dan Hutchinson, Jr., who was sentenced originally to concurrent terms of 25 years'
imprisonment on Count 1 and Counts 16 and 17 for distribution of more than five grams of crack cocaine, *see*
Hutchinson Judgment and Commitment Order at 2, ECF No. 299, had his sentenced reduced to 190 months in 2000,
and then to 184 months, in 2010, pursuant to 18 U.S.C. § 3582(c)(2), *see* Hutchinson Order Regarding Mot.
Sentence Reduction at 1, ECF No. 603, allowing his release from prison in September 2008, *see* Dan Hutchinson,
Federal Inmates By Name, BOP (last accessed August 24, 2022)
https://www.bop.gov/mobile/find_inmate/byname.jsp?race=&sex=#inmate_results.  Lastly, co-defendant Derrick
James Ballard-Bey, who pleaded guilty to one count of conspiracy to distribute crack and one count of assault with a
dangerous weapon under the D.C. Code, and was sentenced to consecutive terms of five years for the conspiracy and
three to nine years for the assault, *see* Ballard Judgment & Commitment at 1, was released from prison in September
2003, *see* Derrick Ballard, Federal Inmates By Name, BOP (last accessed August 24, 2022)
https://www.bop.gov/mobile/find_inmate/byname.jsp?race=&sex=#inmate_results.

in the First Street Crew's trafficking activities. [4]  *See generally* Indictment, ECF No. 4.  White

faced additional charges for his alleged involvement in the murder of Arvell Williams, *id.* at 21–

22, 36, who had purchased narcotics from defendants and was a confidential informant in the

government's investigation, White PSR ¶ 42.

Defendants' individual convictions and sentences are examined in greater detail below,

followed by the procedural history leading to the pending renewed motions for sentencing

reductions.

### 1.  *Conviction and Sentencing*

On February 16, 1994, after a four-month trial, White and Hicks were each found guilty

of five counts, though three respective counts of conviction differed between them.  *See* Verdict

Form at 1–4, 6, ECF No. 238.  Specifically, both defendants were convicted of:

- **Count 1:** Conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base ("Crack Conspiracy"), under 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(iii) (1993), which carried a statutory mandatory minimum penalty of 10 years' and up to life imprisonment;

- **Count 5:** Racketeer influenced and corrupt organizations conspiracy ("RICO Conspiracy"), under 18 U.S.C. § 1962(d), for which the statutory penalty was up to life imprisonment, "because the RICO [Conspiracy] was based on the racketeering activity in Count 1."

*White-2019*, 413 F. Supp. 3d at 20 (internal quotations omitted); *see also* White Judgment and

Commitment Order ("White J&C"), ECF No. 300; Hicks Judgment and Commitment Order

("Hicks J&C"), ECF No. 301; Verdict Form.

In addition, White was convicted of three substantive crack cocaine distribution counts:

- **Counts 6 and 7**: Distribution of detectable amount of crack cocaine under 21 U.S.C. §§ 841(a)(l) & (b)(1)(C), which carried a statutory maximum penalty of 20 years' imprisonment; and

---

[4]      A twenty-count retyped indictment, omitting the charges against Ballard-Bey, was filed on January 28, 1994.  *See* Retyped Indictment, ECF No. 228.

- **Count 18**: Distribution of five grams or more of crack cocaine under 21 U.S.C. §§ 841(a)(l) & (b)(1)(B)(iii) (1993), which carried a statutory mandatory minimum penalty of five years' and up to 40 years' imprisonment.

*White-2019*, 413 F. Supp. 3d at 20; *see also* White J&C; Verdict Form.  The jury was not able to reach a verdict on the five other charges White faced for his role in the Williams murder—including for murder while working in furtherance of a continuing criminal enterprise, in violation of 21 U.S.C. § 848(e)(1)(A) (Count 3), and first degree murder while armed, in violation of 22 D.C. Code §§ 2401, 3202, 105 (Count 4)—resulting in a mistrial on those counts. *White-2019*, 413 F. Supp. 3d at 20–21; Retyped Indictment at 21–22.

Like White, Hicks was also convicted of three additional substantive crack distribution counts:

- **Counts 8 and 10**: Distribution of a detectable crack cocaine under 21 U.S.C. §§ 841(a)(l) & (b)(1)(C), each with a statutory maximum penalty of 20 years' imprisonment; and

- **Count 11**: Distribution of five grams or more of crack cocaine under 21 U.S.C. §§ 841(a)(l) & (b)(1)(B)(iii) (1993), which carried a statutory mandatory minimum penalty of five years' and up to 40 years' imprisonment.

*White-2019*, 413 F. Supp. 3d at 20; *see also* Hicks J&C; Verdict Form.  He was acquitted on Count 15, charging him with the use of a firearm during and in relation to a drug trafficking crime, under 18 U.S.C. § 924(c)(1), Verdict Form at 4, and the jury was unable to reach a verdict on two other counts, resulting in a mistrial on Count 2 (continuing criminal enterprise, in violation of 21 U.S.C. §§ 848(a) & (b)) and Count 14 (crack distribution under 21 U.S.C. § 841(b)(1)(C)).  *See* Order (July 11, 1994), ECF No. 298; Retyped Indictment at 21, 34.

The jury was not asked to and made no specific findings as to "any additional drug weights on the verdict form" for either defendant.  *White II*, 984 F.3d at 83.  On Count One, the jury "was instructed that the government must prove 'some quantity of . . . crack cocaine,' but that 'the actual amount of crack possessed or distributed or the amount alleged in the indictment

is not important and is not an element of the conspiracy offense.'" *White-2019*, 413 F. Supp. 3d at 20 (quoting Trial Tr. (Jan. 28, 1994) at 45:9–13, ECF No. 320).   As to the distribution charge in Count 11 (Hicks) and Count 18 (White), the jury was instructed "that the 'government must prove beyond a reasonable doubt for each count that the defendant distributed a mixture or substance with the total weight of five grams or more which contained crack cocaine.'" *Id.* (quoting Trial Tr. (Jan. 28, 1994) at 30:10–13).   Finally, with regard to the other distribution charges in Counts 6 and 7 (White) and Counts 8 and 10 (Hicks), the jury was instructed "that the government 'need not prove that the defendant distributed any particular numerical amounts or weight of crack but must prove beyond a reasonable doubt for each count that the defendant distributed a detectable or measurable amount of crack.'" *Id.* at 21 (quoting Trial Tr. (Jan. 28, 1994) at 30:4–9).

In May 1994, both defendants were sentenced to life imprisonment. *Id.*  In calculating the applicable sentencing range under the Federal Guidelines Manual for each defendant, the sentencing judge, the Honorable Harold H. Greene, who presided over the entire months-long trial and consequently heard firsthand all of the evidence presented, determined "based on the trial testimony" and established "by a preponderance of the evidence, that the conspiracy [in Count One] involved the distribution, conservatively estimated, of 21.87 kilograms of cocaine base." *Id.* at 20. [5]  This was also the quantity of drugs calculated in the defendants' PSRs.  *See*

---

[5]     In reaching this conclusion over the objection of both defendants, who argued the PSR had "relied on evidence that 'didn't say whether' the drugs were 'powder or crack,'" *White-2019*, 413 F. Supp. 3d at 22 (quoting Sent'g Tr. (May 9, 1994) at 25:4–5, ECF No. 353), Judge Greene found that the 21.87-kilogram quantity was "quite conservative," Sent'g Tr. (May 11, 1994) at 90:4–8, ECF No. 354.  Indeed, the 21.87 kilogram quantity did not even include additional quantities of crack cocaine recovered by law enforcement officials between December 1988 and October 1992 through "'numerous narcotics purchases, and seizures of drugs, from various members of the' First Street Crew . . . amount[ing] to 545.72 grams of cocaine base." *White-2019*, 413 F. Supp. 3d at 22 (quoting White PSR ¶ 35).  Hicks also contested attribution of the 21.87 kilogram quantity to him because, first, he had been in jail for two months of 1991 and therefore argued he was not responsible for the full quantity, and, second, he claimed organizations other than the First Street Crew had sold some of the 21.87 kilograms of crack between 1988 and 1990. *Id.* at 24.  Judge Green rejected Hicks's objections, finding "ample evidence supporting the PSR's drug

White PSR ¶ 41; Hicks PSR ¶ 40.  The quantities of crack cocaine involved in White's other substantive distribution convictions were 3.607 grams (Count 6), 3.682 grams (Count 7), and 49.99 grams (Count 18), and the quantities at issue for Hicks were 0.109 grams (Count 8), 0.433 grams (Count 10), and 5.246 grams (Count 11).  *White II*, 984 F.3d at 83.

For each defendant, the convictions on Count 1 for Crack Conspiracy and Count 5 for RICO Conspiracy were grouped together, pursuant to U.S.S.G. § 3D1.2(d), along with their convictions for distribution of crack cocaine on Counts 6, 7, and 18 (White) and Counts 8, 10, and 11 (Hicks).  *White-2019*, 413 F. Supp. 3d at 21–22, 24.  On Count 1, the crack conspiracy conviction, the base offense level ("BOL"), under U.S.S.G. §§ 2D1.1(a)(3) & (c) (1993), was 42, based on the 21.87-kilogram quantity of crack.  *Id.* at 22, 24.

For White, two levels were added to the BOL of 42, to account for his possession of a dangerous weapon, under U.S.S.G. § 2D1.1(b)(1), "based on his 'participat[ion] in the killing of' Williams, who was killed after being shot by White at close range, the recovery of a pistol with White's fingerprint on the magazine, and the testimony of co-conspirators who watched White 'handle guns' throughout the conspiracy."  *Id.* at 22 (quoting Sent'g Tr. (May 9, 1994) at 38:17–39:1, 42:18–23, ECF No. 353, alterations in original).  Another four levels were added to account for White's leadership role in the First Street Crew, pursuant to U.S.S.G. § 3B1.1(a), as well as two additional levels for obstruction of justice under U.S.S.G. § 3C1.1, *id.*, given the "clear and convincing evidence" that White had killed a cooperating witness, Sent'g Tr. (May 9, 1994) at 43:4–7, as well as the fact that he had warned another member of the First Street Crew, Jeff Thomas, "not to cooperate with" the government's investigation, *id*. at 43:15–17.  Altogether

---

quantity determination," *id*., and further that "Hicks was involved in the conspiracy from 1988 on," Sent'g Tr. (May 11, 1994) at 80:21–22, and thus that the 21.87 kilogram quantity was "appropriately attributed to the conspiracy" and, consequently, "also . . . to" Hicks, *id*. at 132:9–12.

White's total offense level added up to 50, but the Guidelines Manual Sentencing Table caps offense levels at 43.  *White-2019*, 413 F. Supp. 3d at 23 (citing U.S.S.G. § 5A, comment (n.2) ("An offense level of more than 43 is to be treated as an offense level of 43.")).  Consequently, White's sentencing range, even with a criminal history category of I, was life imprisonment.  *Id*.

For Hicks, a total of ten levels were added to the BOL of 42.  Two levels were added, under U.S.S.G. § 2D1.1(b)(1), for Hicks's possession of a dangerous weapon "on multiple occasions during the conspiracy."  *Id*. at 24–25.  Another four levels were added to account for his "leadership role" in the First Street Crew, *id.* at 25, as provided by U.S.S.G. § 3B1.1(a).  An additional two levels were added for obstruction of justice, under U.S.S.G. § 3C1.1, "because Hicks 'bribed' Michael Jackson, a First Street Crew member, 'not to give information up to the grand jury'" that was investigating the murder of Gregory Jackson.  *Id.* (quoting Sent'g Tr. (May 9, 1994) at 84:3–85:1).  Finally, two levels were added, under U.S.S.G. § 3C1.2, due to Hicks's evasion of arrest by car and then, after crashing his vehicle, flight by foot into a stranger's home. *Id*.  Hicks's total offense level thus added up to 52, but was capped at 43.  *Id.* (citing U.S.S.G. § 5A, comment (n.2)).  Consequently, with a criminal history category of III, Hicks's sentencing range was also life imprisonment.  *Id*.

In accordance with the then-mandatory Guidelines, Judge Greene sentenced both defendants to life imprisonment on the Crack and RICO Conspiracy convictions in Counts 1 and 5.  *Id.* at 23, 25.  On the crack distribution convictions, defendants received the statutory maxima:  240 months' incarceration on Counts 6 and 7 (White), and Counts 8 and 10 (Hicks), and 480 months' incarceration on defendants' convictions on Count 11 (Hicks) and Count 18 (White).  *Id.* at 23, 25.  All terms were to be served concurrently.  *Id.* at 23, 25.  In imposing the sentence, the court emphasized defendants' "'very large distribution of . . . twenty-one kilos' of

crack cocaine, and '[their] intimidation or worse of witnesses,'" *id.* at 21 (quoting Sent'g Tr.

(May 11, 1994) at 93:1–2, 12–13, ECF No. 354, first alteration in original), and highlighted the

fact that "defendants were not 'minor offenders,' but rather 'kingpins in the drug trade,'" *id*.

(quoting Sent'g Tr. (May 11, 1994) at 92:3, 6).  The court further commented that "'the record'

was 'replete with' the defendants' 'threats to others,'" including "several witnesses who . . . were

obviously scared," and some of whom "refused to give candid testimony when they finally did

take the stand." *Id*. (quoting Sent'g Tr. (May 11, 1994) at 93:14–17).

## 2.    D.C. Circuit's Decision in *White I*

On direct appeal, both White's and Hicks's convictions were affirmed by the D.C.

Circuit, which found sufficient evidence to support the guilty verdicts.  *See White I*, 116 F.3d at

909.  Over the years, defendants have filed multiple collateral challenges to their convictions, all

of which have been denied. [6]  Both defendants remain incarcerated in the custody of the Bureau

of Prisons ("BOP"), where they have served about 357 months (nearly 30 years) of their life

---

[6]      *See, e.g.*, Mem. Order (Dec. 23, 1999) at 1, ECF No. 479 (summarily denying White's first § 2255 motion,
bringing a claim that the government had an illegal "agreement with a cooperating witness who testified for the
prosecution at trial"); Mem. Order (May 29, 2003), ECF No. 561 (denying White modification of term of
imprisonment); *In re White*, Order, No. 16-3022, ECF No. 654 (D.C. Cir. Feb. 6, 2017) (denying White's
application for leave to file a second § 2255 motion, seeking retroactive application of holding in *Graham v.
Florida*, 560 U.S. 48, 82 (2010)); Mem. Order (Jan. 18, 2018) at 3, ECF No. 675 (denying sentence reduction based
on amendments to the Sentencing Guidelines, because the amendments did not "have the effect of lowering the
defendant's applicable guideline range" (quoting U.S.S.G. § 1B1.10(a)(2)(B))); *In re White*, Order, No. 18-3009,
ECF No. 683 (D.C. Cir. Apr. 13, 2018) (denying White's petition for leave to file a successive § 2255 motion in
which he sought to assert ineffective assistance of counsel); Mem. Order (Nov. 6, 2000), ECF No. 491 (denying
Hicks's initial § 2255 motion asserting that government had an illegal agreement with a cooperating witness at trial,
that trial judge was "hostile to" counsel, and that government failed to provide *Brady* material); Mem. Order at 1
(Feb. 2, 2006), ECF No. 576 (denying motion for sentence reduction based on changes to the Sentencing Guidelines,
since the amendment "made no difference to" Hicks's sentencing range under the Guidelines Manual); *United States
v. Hicks*, 283 F.3d 380 (D.C. Cir. 2002) (denying Hicks's attempt to supplement his initial § 2255 motion with a
claim based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000)); *United States v. Hicks*, No. 18-3020, 2018 WL
5115517 (D.C. Cir. Sept. 19, 2018) (per curiam) (denying certificate of appealability of district court's denial of
Hicks's constitutional challenge based on *Graham*); *United States v. Hicks*, 911 F.3d 623 (D.C. Cir. 2018)
(affirming denial of Hicks's § 2255 motion, challenging enhancement for "Reckless Endangerment During Flight,"
under U.S.S.G. § 3C1.2, as "unconstitutionally void for vagueness"); *United States v. Hicks*, No. 93-cr-97-2 (BAH),
2021 WL 1634692, at *10 (D.D.C. Apr. 27, 2021) (denying compassionate relief because Hicks had been vaccinated
against COVID-19, and "rehabilitation alone, though commendable, cannot be considered as an extraordinary and
compelling reason for release").

sentences.  *See* White PSR at 2; Hicks PSR at 1.

### 3.        District Court's Decision in *White-2019*

In 2019, defendants first moved for relief under Section 404 of the First Step Act, seeking

sentence reductions to "time served and 3 years of supervised release."  *White-2019*, 413 F.

Supp. 3d at 24, 26. [7]  Defendants argued that (1) they were eligible for a reduced aggregate

sentence under Section 404 of the First Step Act, and (2) such a reduced sentence was

appropriate in view of the factors in 18 U.S.C. § 3553(a).  *See* Def. White's Emergency Suppl.

Mot. Reduce Sentence Pursuant to the First Step Act of 2018 at 7–8, ECF No. 690; Def. Hicks's

Emergency Suppl. Mot. Reduce Sentence Pursuant to the First Step Act of 2018 at 7–8, ECF No.

688.  In opposition, the government contended that no reduction was permitted under Section

404 and that, even if permitted, no reduction was warranted, such that the motions should be

"summarily den[ied]."  Gov't Opp'n to 1st White Mot. Reduce Sentence at 1, ECF No. 703;

Gov't Opp'n to 1st Hicks Mot. Reduce Sentence at 1, ECF No. 702.

This Court disagreed with the government's first argument, finding instead that

defendants were "eligible for sentence reduction relief under Section 404" of the First Step Act

on Counts 1, 5, 11, and 18 because (1) they had been convicted of "federal statutory violations

occurring prior to August 3, 2010" and (2) for those offenses, "the 'statutory penalties' for the

'federal criminal statute[s] applied to the defendants at sentencing were modified by FSA's

---

[7]        A third co-defendant, Ronald Hughes, Jr., also brought a First Step Act motion that was addressed in and
denied by *White-2019*, without appeal.  Hughes, who had "initially requested a reduced sentenced to time served,"
was released from prison while his motion was pending, and thereafter revised his request to seek "only a reduced
term of supervised release from five to three years."  413 F. Supp. 3d at 19 n.1 (internal quotation omitted).  Though
Hughes's request for relief under the First Step Act was denied, this Court explained he became eligible for early
termination of his supervision after one year of supervised release.  *Id.* at 53 n.15.  After *White-2019* was issued,
Hughes sought such relief, and was granted early termination of his supervision, with the government's consent, on
June 24, 2020.  *See* Mem. Order, *United States v. Hughes*, 93-cr-97 (BAH), ECF No. 727; *see supra* n.3.

section 2 or 3." *White-2019*, 413 F. Supp. 3d at 31 (quoting First Step Act § 404(a)). [8]

Nevertheless, the Court found that, with the exception of Hicks's sentence on Count 11, relief

was unavailable to defendants on their convictions, due to the drug quantities the sentencing

judge found to be involved for each count. *Id.* at 50. Noting that, due to the drug quantities

involved in their offense conduct, FSA section 2 would not have changed "defendants' statutory

penalties . . . on Counts 1, 5, and 18," and that "their sentencing ranges under the current

Guidelines Manual would remain unchanged as well," *id.* at 51, this Court concluded that "no

sentence reduction [was] available to award" to White and Hicks, *id*. at 50.

Defendants' argument that "only drug quantities found by a *jury* beyond a reasonable

doubt may be relied on when exercising discretion under Section 404(b)" was rejected. *Id.* at 43

(emphasis added). Instead, the Court found that *Apprendi v. New Jersey*, 530 U.S. 466 (2000),

and *Alleyne v. United States*, 570 U.S. 99 (2013), on which defendants had relied, were "not

implicated" in a discretionary sentencing modification under the First Step Act, because Section

404 of the Act does not heighten any defendant's sentencing exposure, nor does the statute

authorize retroactive application of these two cases. *Id.* As a result, the Court concluded that

reliance on "the defendants' judge-found drug quantities" was appropriate, *id.*, even if it left

"their statutory penalty ranges the same and thereby 'effectively' increase[d] their statutory

---

[8]     Sections 2 and 3 of the FSA did *not* modify the statutory penalties for 21 U.S.C. § 841(b)(1)(C), and thus defendants were found to be ineligible for a reduction in their sentences on Counts 6 and 7 (White) and Counts 8 and 10 (Hicks). *White-2019*, 413 F. Supp. 3d at 31 n.6. While *White II* reached a different conclusion as to defendants' § 841(b)(1)(C) convictions, 984 F.3d at 86 (noting that although Counts 6 and 7 (White) and Counts 8 and 10 (Hicks) were "not raised as part of this appeal," those four charges also "appear to be covered offenses"), the Supreme Court subsequently reached the same legal conclusion as that in *White-2019* regarding 21 U.S.C. § 841(b)(1)(C). *See Terry v. United States*, 141 S. Ct. 1858, 1862–63 (2021) ("Before 2010, the statutory penalties for [21 U.S.C. § 841(b)(1)(C)] were 0-to-20 years, up to a $1 million fine, or both, and a period of supervised release. After 2010, these statutory penalties remain exactly the same. The Fair Sentencing Act thus did not modify the statutory penalties for petitioner's offense."). Defendants concede as much. *See* White Mot. at 18; Hicks Mot. at 19. In any event, were defendants to be sentenced for these offenses today, they would be subject to the same statutory maximum of twenty years, *see* 21 U.S.C. § 841(b)(1)(C), and have already served that time, *White-2019*, 413 F. Supp. 3d at 18.

penalt[ies]," when compared to the statutory penalties based on the jury-found quantities, *id.* at 44.

Given the Court's conclusion on the lack of availability of relief, the Court did not dwell on consideration of the § 3553(a) factors, other than to conclude that "the nature and circumstances of the defendants' crimes, and the severity of the defendants' offense conduct, involving the distribution of crack cocaine over several years and violence, including the murder and intimidation of witnesses against them, would not warrant relief," regardless of whether relief were available. *Id.* at 51. Noting White's "large-scale drug distribution and intolerable violence," including his involvement in at least one, and as many as four, murders of government witnesses, and further pointing out that his "time in prison provide[d] troubling evidence that he ha[d] not remediated," the Court found that he did "not merit a sentence reduction." *Id.* at 52. As for Hicks, the Court pointed to his "obstructive conduct" as well as his "substantial disregard for others by fleeing from law enforcement officers when they attempted to arrest him," finding that "[f]or these reasons, no additional sentence reduction would be warranted even if available." *Id.* Consequently, defendants' motions "pursuant to Section 404 of the First Step Act, [were] denied, except that the sentence imposed on Eric Hicks for his conviction on Count 11 [was] reduced to time-served." *Id.* at 53. [9]

### 4.    D.C. Circuit's Decision in *White II*

Defendants appealed, and the D.C. Circuit reversed and remanded the case for "new proceedings." *White II*, 984 F.3d at 92. Rejecting the two-step framework assessing both eligibility for and availability of relief applied in *White-2019*, the Circuit concluded that relief

---

[9]    Post-FSA, the statutory maximum penalty for Hicks's offense in Count 11, involving the distribution of 5.426 grams of cocaine base, *White II*, 984 F.3d at 83, is now 20 years, 21 U.S.C. § 841(b)(1)(C), and Hicks had already served nearly 30 years in prison, *see White-2019*, 413 F. Supp. 3d at 18.

was available under the First Step Act's section 404(b), "even if the Fair Sentencing Act did not modify the statutory range for the specific drug quantit[ies] attributed to [them]." *Id.* at 87. The Circuit explained that "whether an offense is 'covered' does not depend on the actual drug amounts attributed to a defendant," but only "whether the defendant was convicted of an offense with a statutory penalty range that the Fair Sentencing Act altered." *Id.* at 86. Thus, defendants' convictions in Count 1 (Crack Conspiracy, under 21 U.S.C. §§ 846 & 841(b)) and Count 5 (RICO Conspiracy, under 18 U.S.C. § 1962(d)), and defendant White's conviction on Count 18 (crack distribution, under 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B)(iii)), were "covered offenses," because the FSA had "changed the quantity of crack cocaine necessary to trigger the penalties for these violations" and their sentences could be reduced. *Id.* at 85–86.

In addition, while acknowledging the "wide discretion" given to district courts "in the First Step Act context," *White II* stressed that "resentencing decision[s]" still "must be procedurally reasonable and supported by a sufficiently compelling justification." *Id.* at 91 (quoting *United States v. Boulding*, 960 F.3d 774, 784 (6th Cir. 2020)). [10]  In this regard,

---

[10]      *White II* cautioned this Court to "base its determinations on accurate factual findings" and expressed concern that *White-2019* "appears to rely on clearly erroneous evidence in weighing Hicks's request for relief," 984 F.3d at 93, pointing to the statement in *White-2019* that "Hicks engaged in obstructive conduct, bribing another First Street Crew member to withhold information from the grand jury that was investigating him for murder," *White-2019*, 413 F. Supp. 3d at 52 (citing Sent'g Tr. (May 9, 1994) at 84:3–85:1; Hicks PSR ¶¶ 69, 89). *White II* expressed uncertainty as to "whether [this] Court mistakenly believed that Hicks was investigated for committing murder or instead for inappropriate involvement in a murder investigation." 984 F.3d at 93. Wholly consistent with this Court's statement in *White-2019*, the Hicks PSR states that Michael Jackson, another member of defendants' Crew, "was subpoenaed by a Grand Jury investigating *White and Hicks' involvement* in the murder of Gregory Jackson," Hicks PSR ¶ 69 (emphasis added), and that Hicks attempted to obstruct justice when he "told Jackson not to disclose anything, . . . hired a lawyer for $500 for Jackson for his next appearance, [and] paid Jackson $200 worth of crack on two later occasions to reward him for not disclosing information to the Grand Jury," *id.* Notably, Hicks did not at the time of sentencing, nor in connection with the pending motions, contest the statement in his PSR that the grand jury was investigating his "involvement" in the Gregory Jackson murder. *See* Hicks Mot. at 6 (describing the 2-level obstruction of justice adjustment as based on Hicks's provision "of crack and money to a member of the First Street Crew to tell him about the grand jury," and quoting the government's statement at sentencing that Hicks had "paid off Michael Jackson to come down to the grand jury and lie" and not to "tell them about the AK-47" or "whose it was" (first quoting Retyped Indictment at 13–15 and then quoting Sent'g Tr. (May 11, 1994) at 125:14–18)). According to White's PSR, Gregory Jackson was shot and killed, on January 1, 1992, by White, "Ronald Hughes, and two other individuals" and White "and his co-defendants were indicted on charges of First Degree Murder" in D.C. Superior Court, White PSR ¶ 109, although the charges appear to have been dismissed, *see United*

notwithstanding *White-2019*'s review of the jury instructions given at trial as not requiring any finding of drug quantity beyond the quantity stated in the charge, 413 F. Supp. 3d at 20–21, and detailed description of the drug quantity discussion at the time of sentencing and how the sentencing judge resolved disputes over that issue in determining the base offense level under the applicable Guidelines, *id*. at 22–24, *White II* noted this Court's reliance on judge-found drug quantities and a perceived "failure to mention the jury-found drug quantities," 984 F.3d at 92, and instructed that "[t]he court may consider both judge-found and jury-found drug quantities as part of its exercise of discretion" to grant relief to an eligible defendant, *id*. at 88. The panel further expressed concern that this Court had not "properly weighed the factors listed in 18 U.S.C. § 3553(a)," *id.* at 81, or "give[n] due consideration to all relevant factors in weighing Appellants' requests for relief," including "the extensive mitigating evidence offered by Appellants," *id.* at 93, and "post-sentencing conduct," *id.* at 90 (quoting *United States v. Hudson*, 967 F.3d 605, 613 (7th Cir. 2020)). This case was therefore remanded with instruction to reconsider White and Hicks's requests for relief, giving "proper consideration to the sentencing factors outlined in 18 U.S.C. § 3553(a)," including "the mitigating evidence offered by Appellants." *Id*. at 92–93.

Following remand, the parties were provided an opportunity for further briefing. *See* Min. Order (Mar. 4, 2021). Defendants filed supplemental motions to reduce their sentences under the First Step Act, along with copious exhibits, which together provided additional detail as to their respectively challenging childhoods and activities while incarcerated. *See* White Mot.

---

*States v. White*, 1992-FEL-849 (D.C. Super. Ct. 1991). Put simply, the statement in *White-2019* prompting the Circuit panel's caution in fact accurately reflected information in the Hicks PSR, was a matter discussed at the time of Hicks's original sentencing, and was plainly a fact underlying Hicks's *obstructive behavior,* warranting a two-level increase in offense levels, under U.S.S.G. § 3Cl.l, as noted in Hicks PSR ¶ 89, which is precisely the paragraph cited in *White-2019*, 413 F. Supp. 3d at 52. Thus, given the clarity of the record and citation thereto in *White-2019*, the caution issued in *White II* is, at best, gratuitous.

at 22–38; Hicks Mot. at 23–39.  The government filed oppositions to defendants' motions, arguing that "[t]he nature and circumstances of defendant[s'] offenses weigh strongly against" a reduced sentence, and that "any mitigation evidence . . . is ultimately outweighed by the § 3553(a) factors that counsel against a sentencing reduction."  Gov't's White Opp'n 1–2; Gov't's Hicks Opp'n 1–2.  Defendants filed their respective replies in support of their supplemental motions, *see* Def. Hicks's Reply Supp. Suppl. Section 404 Mot. ("Hicks Reply"), ECF No. 746; Def. White's Reply Supp. Suppl. Section 404 Mot. ("White Reply"), ECF No. 747, and have continued to supplement their motions with additional exhibits, as well as notices of supplemental authority, prompting additional government responses, the last of which was filed on August 1, 2022.  *See* Def. Hicks's Suppl. Supp. Section 404 Pleadings, ECF No. 753; Def. White 2d Suppl. Supp. Section 404 Pleadings, ECF No. 756; Def. Hicks's 2d Suppl. Supp. Section 404 Pleadings, ECF No. 757; Def. Hicks's 3d Suppl. Supp. Section 404 Pleadings, ECF No. 758; Def. Hicks's 1st Not. Suppl. Auth., ECF No. 748; Def. White's 1st Not. Suppl. Auth., ECF No. 749; Def. White's 2d Not. Suppl. Auth., ECF No. 754; Def. Hicks's 2d Not. Suppl. Auth., ECF No. 755; Defs.' 3d Not. Suppl. Auth., ECF No. 761; Gov't's Resp. Def. Hicks's 3d Not. Suppl. Auth., ECF No. 763; Gov't's Resp. Def. White's 3d Not. Suppl. Auth., ECF No. 764.  The pending motions are now ripe for resolution.

## II.    STATUTORY BACKGROUND AND LEGAL STANDARD

The Anti-Drug Abuse Act of 1986 provided three quantity-based penalty ranges for drug offenses under 21 U.S.C. § 841(a):  Ten years to life in prison, five to 40 years in prison, and up to 20 years in prison, Pub. L. No. 99-570 § 1002, 100 Stat. 3207, 3207-2 to 3207-4, with the quantities that triggered different penalty levels varying based on the scheduled substance involved in the offense.  "For nearly 25 years, federal criminal law punished offenses involving

crack cocaine far more harshly than offenses involving powder cocaine." *United States v. Lawrence*, 1 F.4th 40, 42 (D.C. Cir. 2021). In 2010, "[a]fter two decades of criticism, Congress reduced, but did not eliminate, the crack-to-powder disparity in the Fair Sentencing Act," *id.*, by "reduc[ing] the disparity between cocaine base and powder cocaine from 100-to-1 to 18-to-1," *id*. (quoting *White II*, 984 F.3d at 81–82, other citations omitted). Specifically, the FSA raised the crack-cocaine threshold quantities for triggering certain penalty ranges for convictions, under 21 U.S.C. § 841, but did not apply these changes retroactively to defendants who had already been sentenced for crack-cocaine offenses. *Id.* at 43. [11] This changed in 2018 with the enactment of the First Step Act. *Id.*

The First Step Act was "'intended to rectify disproportionate and racially disparate penalties' in federal sentencing" for crack and powder cocaine offenses. *White II*, 984 F.3d at 80 (quoting *Boulding*, 960 F.3d at 782). To this end, section 404 of the First Step Act allows defendants to seek reduced sentences if they committed certain "covered offense[s]" prior to the enactment of the FSA and are not subject to the "limitations" in Section 404(c). First Step Act §§ 404(a), (c). For eligible defendants, Section 404(b) authorizes, but does not require, a court to exercise discretion to adjust the sentence by "impos[ing] a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act were in effect at the time the covered offense was committed." *Id.* § 404(b) (alterations omitted).

In this way, Section 404(b) "allows district courts to consider intervening changes of law or fact in exercising their discretion to reduce a sentence pursuant to the First Step Act," so long

---

[11]    Congress increased the cocaine base quantity triggering the penalty of five to 40 years' imprisonment, under 21 U.S.C. § 841(b)(1)(B), from five grams to 28 grams, and the quantity triggering the penalty of 10 years to life imprisonment, under § 841(b)(1)(A), from 50 grams to 280 grams, effectively raising the quantity covered by the catch-all provision in 841(b)(1)(C) from amounts under five grams to amounts under 28 grams, but without any direct amendment to that last statutory subsection. *See* FSA § 2.

as they "explain their decisions and demonstrate that they considered the parties' arguments."
*Concepcion*, 142 S. Ct. at 2404.  The D.C. Circuit has instructed that, in determining whether a
sentence reduction is warranted for an eligible defendant, a court must consider not only the 18
U.S.C. § 3553(a) factors, but also "new statutory minimum or maximum penalties; current
Guidelines; post-sentencing conduct; and other relevant information about a defendant's history
and conduct." *Lawrence*, 1 F.4th at 44 (quoting *White II*, 984 F.3d at 90). [12]

## III.   DISCUSSION

*White II* held that whether an offense is covered under Section 404 depends only on the
statute of conviction itself, under a "categorical approach."  984 F.3d at 85–86.  Put another way,
so long as the FSA modified the statutory penalty range for the offense of conviction, that
offense is "covered," regardless of the specifics of a defendant's conduct, including the drug
quantities involved.  *Id.*; *see United States v. Palmer*, 35 F. 4th 841, 850 (D.C. Cir. 2022)
("[T]here is no availability test and [] in assessing eligibility, the district court cannot determine,
using judge- or jury-found drug quantities, what effect the Fair Sentencing Act would have had
on a defendant's sentence." (internal quotations omitted)).  Applying this logic to defendants'

---

[12]     Pre-*Concepcion*, the extent to which the D.C. Circuit would require more than mere consideration of "new
statutory minimum or maximum penalties" and instead would view the new FSA penalties as bounds on the exercise
of discretion was murky.  *See, e.g., United States v. Palmer*, 35 F.4th 841, 851 (D.C. Cir. 2022) (in "set[ting] the
lower bound of the district court's discretion 'to impose a sentence "as if section 2 . . . of the Fair Sentencing Act
[was] in effect,"'" directing that "the court must use the revised penalty range now applicable to the drug amount in
the original statute of conviction." (*quoting White II*, 984 F.3d at 86)); *id.* (citing approvingly *United States v.
Collington*, 995 F.3d 347, 356–57 (4th Cir. 2021), which rejected government's argument that "Congress intended
to retain sentences *above* the statutory maximum it deemed appropriate for [defendant]'s offense of conviction" and
concluding "that district courts abuse their discretion in letting stand a sentence of imprisonment that exceeds the
statutory maximum established by the Fair Sentencing Act" (emphasis in original)).  In *Concepcion,* the Supreme
Court did not explicitly address whether a new statutory maximum under the FSA and First Step Act cabins, by
*requiring,* the exercise of discretion to reduce a sentence to the outer bounds of new statutory minima and maxima,
but this decision's broad general statements that a court's "discretion is bounded only when Congress or the
Constitution expressly limits the type of information a district court may consider in modifying a sentence,"
*Concepcion*, 142 S. Ct. at 2398, and "[n]othing in the First Step Act contains such a limitation," *id.* at 2396, such
that "a district court is not required to modify a sentence for any reason," *id.* at 2402, provides clarity that discretion
may be exercised to deny resentencing because, among other reasons, the specific conduct of the original offense
still warrants the originally imposed sentence.

convictions, the *White II* panel concluded—incorrectly to defendants' convictions under 21 U.S.C. § 841(b)(1)(C), *see supra* n.8—that each of defendants' counts of convictions were "covered offenses" under Section 404(a).  *Id.* at 85.  Since none of the limitations set forth in Section 404(c) apply, both defendants are eligible for resentencing under Section 404(b) on Counts 1 and 5, and White on Count 18, for which convictions they remain imprisoned.

While sentencing reduction relief is "*permitted*" under Section 404(b), the question here is whether defendants' "motion[s] for reduced sentence *should* be granted," *id.* at 88 (emphasis in original).  In considering this question, a court has "'broad' but not 'unfettered'" discretion. *Lawrence*, 1 F.4th at 43 (quoting *White II*, 984 F.3d at 88).  Guided by *White II*, this Court must consider "all relevant factors" in determining "whether a sentence imposed is sufficient, but not greater than necessary, to fulfill the purposes of § 3553(a)."  984 F.3d at 90 (quoting *Hudson*, 967 F.3d at 609, 611).  "These [factors] include new statutory minimum or maximum penalties; current Guidelines; post-sentencing conduct; and other relevant information about a defendant's history and conduct," paying particular attention to defendants' "post-sentencing conduct."  *Id.* (quoting *Hudson*, 967 F.3d at 609).  *See also Concepcion*, 142 S. Ct. at 2396 (affirming that courts "may consider other intervening changes of law (such as changes to the Sentencing Guidelines) or changes of facts (such as behavior in prison) in adjudicating a First Step Act motion" and are "obligated to consider nonfrivolous arguments presented by the parties" but are "not compel[led] . . . to exercise their discretion to reduce any sentence based on those arguments"); *see also id.* at 2406–07 (under the majority's decision, "district courts must . . . calculat[e] the new Guidelines range based solely on the changes to the crack-cocaine sentencing ranges" but "then have free rein either to take into account—or to completely disregard—other intervening changes since the original sentencing," which "blanket discretion . . . will therefore

20

produce massive inequities in how the First Step Act is implemented on the ground" (Kavanaugh, J., dissenting)).

In originally denying defendants' requested relief, this Court construed the First Step Act to curtail sentence reduction discretion to the actual quantity of crack cocaine involved in the offense conduct, and therefore defendants' mitigating circumstances were not addressed extensively.  Now, taking into consideration all of the mitigating evidence and arguments submitted by the parties; the changes to the statutory and Guidelines ranges; the nature and circumstances of defendants' offenses and the jury *and* judge-found quantities of crack cocaine at issue in the conspiracy; and the other factors noted by *White II*, this Court finds that reducing defendants' sentences to terms near the top of the current applicable statutory penalty range is appropriate to avoid creating unwarranted disparities between similarly situated defendants sentenced today, while reflecting the seriousness of their offenses, which involved violence and obstructive conduct, but did not involve murder convictions.

The following section begins by addressing the "new statutory minimum or maximum penalties" and "current Guidelines," before applying the remaining § 3553(a) factors, with special attention given to defendants' "post-sentencing conduct," and consideration of the remedial purposes of the FSA and First Step Act.  *White II*, 984 F.3d at 90 (quoting *Hudson*, 967 F.3d at 609).

### A.  New Statutory Minimum or Maximum Penalties

*White II* instructs that consideration be given to any "new statutory minimum or maximum penalties," *id.*, using "the revised penalty range now applicable to the drug amount in the original statute of conviction," to determine whether "to impose a sentence as if section 2 of the Fair Sentencing Act was in effect," *Palmer*, 35 F.4th at 851 (quoting *White II*, 984 F.3d at 86

(alterations and quotations omitted); *id.* at 844 (remanding denial of First Step Act motion to reduce defendant's life imprisonment sentence for "running a continuing criminal enterprise (CCE) centered around crack cocaine distribution" "[b]ecause it is unclear whether the district court began from the correct statutory mandatory minimum sentence" for the district court "to clarify the applicable baseline").  Here, examining only the FSA's changes to the original statutes of conviction—and ignoring any actual drug quantities involved in the defendants' offense conduct—would result in new statutory maximum and minimum penalties for defendants' convictions on Count 1 (Crack Conspiracy) and Count 5 (RICO Conspiracy) and White's conviction on Count 18.

In Count 1, both defendants were convicted under 21 U.S.C. §§ 846 & 841(b)(1)(A)(iii) (1993), which imposed, at the time, a penalty range of ten years to life imprisonment for engaging in a "conspiracy to distribute 50 grams or more of cocaine base."  *White II*, 984 F.3d at 83.  The FSA reduced the penalty range applicable to an offense involving "at least 50 grams of cocaine base" to five to forty years' imprisonment.  *See* 21 U.S.C. §§ 841(b)(1)(A) & (B).  Thus, as this Court has previously recognized in the compassionate release context, if defendants were sentenced for the same quantity of "at least 50 grams of cocaine base," specified in Count 1, "today, [they] would be subject to the five-to-forty-years imprisonment range for Count 1," and not life imprisonment.  *United States v. Hicks*, No. 93-cr-97-2 (BAH), 2021 WL 1634692, at *8 (D.D.C. Apr. 27, 2021) (citing 21 U.S.C. § 846).

Similarly, on Count 5, both defendants were convicted for their role in a RICO conspiracy, under 18 U.S.C. § 1962(d).  *See* Verdict Form at 2, 4.  The RICO conviction was "based on a racketeering activity for which the maximum penalty includes life imprisonment," 18 U.S.C. § 1963(a), namely, the crack conspiracy charged in Count 1, *see* 21 U.S.C. § 846,

making the maximum penalty for Count 2 at the time also life in prison.  Post-FSA, the Crack

Conspiracy charge in Count 1 would no longer carry a statutory maximum of life imprisonment,

*see id.*, and thus "if defendant[s] were sentenced for the offenses as charged today," they would

be subject "to a maximum term of imprisonment of twenty years for Count 5," *Hicks*, 2021 WL

1634692, at *8 (citing 18 U.S.C. §§ 1962(d), 1963(a)). [13]

Finally, on Count 18, White was convicted of distributing "5 grams or more" of crack

cocaine, in violation of 21 U.S.C. § 841(b)(1)(B)(iii) (1993), which at the time carried a penalty

range of five to 40 years' imprisonment.  *White II*, 984 F.3d at 83.  The FSA amended the statute

to increase the quantity from five grams to 28 grams to trigger this penalty, such that a quantity

of at least five grams but less than 28 grams is now subject to a maximum of 20 years'

imprisonment with no mandatory minimum sentence, under 21 U.S.C. § 841(b)(1)(C).

In sum, were defendants convicted today with the same quantities of crack cocaine

expressed in their original charges—divorced from the actual crack cocaine quantities involved

in their offense conduct—the maximum sentences they could receive would be 40 years for their

convictions on Count 1, and twenty years for their convictions on Count 5 and White's

conviction on Count 18.  *See* 18 U.S.C. §§ 1962(d), 1963(a); 21 U.S.C. § 841(b)(1)(A).  White

and Hicks concede that the revised penalty ranges do not mean "that this Court *must* resentence

[them]," but argue these revised ranges are a "persuasive reason[] that a reduced sentence is

warranted."  White Reply at 5–6; Hicks Reply at 5 (emphasis in original).

---

[13]     *White II* erroneously stated that under "the modified penalty ranges provided by the Fair Sentencing Act,
the District Court . . . had discretion to impose reduced sentences as low as 5 years for Count[] . . . 5."  984 F.3d at
86.  Instead, as all parties acknowledge, "the 'revised penalty range' applicable to Count 5 should be 0 to 20 years of
incarceration."  Gov't White Opp'n at 12; *see also* White Mot. at 19 n.3; Hicks Mot. at 20 n.2; Gov't Hicks
Opp'n at 11.

While the revised penalty ranges weigh in favor of reducing defendants' sentences, this consideration is not dispositive in constraining sentencing reduction discretion. *Cf. supra* n.12. Defendants, whom the sentencing judge characterized as "kingpins in the drug trade," Sent'g Tr. (May 11, 1994) at 92:6, were originally charged with the most serious drug crimes carrying the most severe penalties then available. [14]  Their offense conduct, including the quantity of crack cocaine involved, would today continue to support their prosecution for and conviction of the most serious drug charges under current versions of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii) (requiring at least 280 grams or more of cocaine base).  Consequently, though "a defendant sentenced today" under the same statute "would face a maximum sentence far short of life," contrary to defendants' argument, such a defendant would not be "identical in every way" to these defendants, White Reply at 6; Hicks Reply at 6, but instead would have been responsible for incomparably smaller quantities of crack, while these defendants' offense conduct would, again, support a prosecution and conviction for violating 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii). With that said, these new statutory penalties reflect "Congress's intent to rectify disproportionate and racially disparate sentencing penalties," of which, under *White II*, this Court must "take account."  984 F.3d at 81.  For this reason, this Court finds that the penalty reductions weigh in defendants' favor, even if, standing alone, they do not compel a reduction in defendants' sentences nor otherwise dictate the outcome of these First Step Act motions.  *See* First Step Act §404(c) ("Nothing in this section shall be construed to require a court to reduce any sentence

---

[14]    If defendants' original argument had prevailed "that only drug quantities found by a jury beyond a reasonable doubt may be relied upon when exercising discretion under Section 404(b)," *White-2019* at 43, their view that new FSA-amended maximum and minimum statutory penalties should require the exercise of discretion in resolving sentence reduction motions would be more persuasive.  This Court, however, rejected that interpretation for detailed reasons, *id.* at 43–47, as has the Supreme Court, *Concepcion*, 142 S. Ct. at 2402 (making clear that, under the First Step Act, "a district court is not required to modify a sentence for any reason").

pursuant to this section."); *Concepcion*, 142 S. Ct. at 2396 ("the First Step Act does not compel

courts to exercise their discretion to reduce any sentence . . . .").

## B.   Current Guidelines Application Under § 3553(a)(4)

*White II* instructs the Court to take into account what the advisory Guidelines range for

defendants' convictions would be, were they to be convicted of the same charges today.  984

F.3d at 90; *see also* 18 U.S.C. § 3553(a)(4).  The Supreme Court has provided additional

guidance that "[a] district court cannot, however, recalculate a movant's benchmark Guidelines

range in any way other than to reflect the retroactive application of the Fair Sentencing Act,"

meaning the sentencing range is calculated "as if the Fair Sentencing Act's amendments had

been in place at the time of the offense," such that the re-calculated "Guidelines range

'anchor[s]' the sentencing proceeding."  *Concepcion*, 142 S. Ct. at 2402 n.6 (alteration in

original); *id.* at 2403 n.8 ("To reiterate, the First Step Act does not require a district court to

recalculate a movant's Guidelines in any respect other than applying the Fair Sentencing Act.").

Due to the quantity of crack involved in their Crack Conspiracy convictions in Count 1,

under current Guidelines, defendants' BOL would be 36, under U.S.S.G. §§ 2D1.1(a)(5) &

(c)(2). [15]  The same increase in offense levels for specific offense characteristics and obstruction

---

[15]     Defendants apparently challenge this application of U.S.S.G. § 2D1.1(a) in supplemental motions
informing "the Court of the Department of Justice's support for the elimination of the crack-to-powder disparity
both prospectively and retroactively."  Def. White's 2d Suppl. Supp. Section 404 Pleadings at 1; *see also id.*, Ex. 11,
Statement of the U.S. Dep't of Justice Before the U.S. Senate Committee on the Judiciary (June 22, 2021), ECF No.
756-1; Def. Hicks's 2d Suppl. Supp. Section 404 Pleadings; *id.*, Ex. 17, Statement of the U.S. Dep't of Justice
Before the U.S. Senate Committee on the Judiciary (June 22, 2021), ECF No. 757-1.  Defendants also submit four
sentencing memoranda in unrelated cases in three other jurisdictions where "the government supported use of the
1:1 crack to powder ratio."  Def. Hicks's 2d Suppl. Supp. Section 404 Pleadings at 1; *see also id.*, Exs. 18–21, ECF
No. 757-1 (government sentencing memoranda in recent cases before the Western District of New York, Middle
District of Pennsylvania, and Western District of Michigan) (filed on behalf of White at ECF No. 756-1).  If
defendants were sentenced for 21 kg of *powder* cocaine under today's Guidelines, their base offense level would be
32, leading to total offense levels, with the same upward adjustments, of 40 for White and 42 for Hicks, and a
Guidelines sentencing range for White of 292–365 months and for Hicks of 360 months to life imprisonment.  The
government has not taken the position in this case, nor in this district, that the crack-to-powder difference in
penalties should be eliminated, and that is certainly not a mandate of the First Step Act.  Thus, the fact that

of justice from the original sentencing apply, with the result that the total offense level for each defendant would exceed the Sentencing Table's maximum total offense level of 43 and, again, produce advisory Guidelines sentencing ranges of life imprisonment. [16]

The wrinkle in this Guidelines determination is that, despite the quantity of crack involved in Count 1, were defendants sentenced under statutes of conviction specifying an intent to distribute only 50 grams or more of cocaine base today, the maximum sentence by statute would be 40 years, rather than life imprisonment. *See* 21 U.S.C. § 841(b)(1)(B). This has a direct impact on the maximum sentencing range under the Guidelines, which provide that a "sentence may be imposed at any point within the applicable guideline range, provided that the sentence is not greater than the statutorily authorized maximum sentence." U.S.S.G. § 5G1.1(c)(1); *id.* § 5G1.2, comment n.3(B) ("where a statutorily authorized maximum sentence on a particular count is less than the minimum of the applicable guideline range, the sentence imposed on that count shall not be greater than the statutorily authorized maximum sentence on that count."). In other words, regardless of the actual quantity of crack involved and other upward adjustments in the offense level supported by the offense conduct, the maximum of the re-calculated Guideline range is 40 years. Defendants seek a more generous sentence reduction than 40 years and request time served (roughly 30 years). *See* White Reply at 23 (asserting that "a 40-year sentence is unwarranted in this case" but "would be preferable to spending the rest of his life in prison"); Hicks Reply at 24 (same).

---

defendants' Guidelines ranges would be slightly lower were the crack-to-powder disparity eliminated amounts to a theoretical exercise that does not supplant what the actual Guidelines currently provide.

[16]     Specifically, White would be subject to three upward adjustments, for possession of a dangerous weapon (2 points, under U.S.S.G. § 2D1.1(b)(1)); for his leadership role in the conspiracy (4 points); and for his obstruction of justice (2 points), bringing his total offense level to 44. Gov't's White Opp'n at 14. For Hicks, the same three upward adjustments would apply, as well as an additional adjustment for reckless endangerment during flight (2 points, under U.S.S.G. § 3C1.2), bringing his total offense level to 46. Gov't's Hicks Opp'n at 14–15. Defendants do not contest that these adjustments would apply. *See generally* White Reply at 6–8; Hicks Reply at 6–7.

The government disputes this sentencing range determination, arguing that White and Hicks's sentencing range today remains life imprisonment, just as it was at the time of their original sentencing in 1994, regardless of the new statutory maximum of 40 years applicable to their FSA-amended statutes of conviction.  *See* Gov't's White Opp'n at 14–15; Gov't's Hicks Opp'n at 14–15.  While this Court disagrees with the government that the new Guidelines sentencing range applicable to defendants remains life imprisonment, the fact that this new sentencing range arises solely from the cap on the range's maximum due to the FSA-amended thresholds, is relevant to considering whether this new range warrants any sentence reduction and, if so, the extent of any reduction.

Unlike the statutory regime, which sorts crack distribution convictions into three very broad, quantity-based penalty ranges for purposes of determining just punishment, the Guidelines are more nuanced and designed to account for the specific facts of a defendant's offense conduct.  *See* U.S.S.G. Ch. 1, Pt. A, Subpt. 1 (explaining the Guidelines are written to be "descriptive of generic conduct" rather than "track[ing] purely statutory language," and to "take account of a number of important, commonly occurring real offense elements such as role in the offense, the presence of a gun, or the amount of money actually taken, through alternative base offense levels, specific offense characteristics, cross references, and adjustments").  Given the drug quantities and offense conduct involved, defendants could easily be charged with the most severe penalties today, under 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii), just as they were originally.  This is borne out by the fact that their recommended Guideline range would remain unaltered, but for the cap of 40 years applicable to their FSA-amended statutes of conviction. Thus, standing alone, the new Guidelines sentencing range applicable to defendants does not dictate the outcome of their sentence reduction motions, although the 40-year cap that would be

applicable under today's Guidelines, due to the FSA's statutory changes, is another factor weighing in favor of granting a sentencing reduction.

## C.   Remaining § 3553(a) Factors, Including Defendants' Post-Sentencing Conduct

Consistent with the instructions in *White II*, 984 F.3d at 91, next addressed are the relevant § 3553(a) factors, including (1) the nature and circumstances of the offense, (2) defendants' history and characteristics, (3) defendants' post-sentencing conduct, (4) the need to avoid unwarranted sentencing disparities, and (5) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes by defendants.  *See* 18 U.S.C. §§ 3553(a)(1)–(2), (6).  At the outset, while "district courts bear the standard obligation to explain their decisions and demonstrate that they considered the parties' arguments," which are nonfrivolous, *Concepcion*, 142 S. Ct. at 2404, the Supreme Court has made amply clear that "a district court is [not] required to articulate anything more than a brief statement of reasons," *id.*, and the First Step Act does not "require a district court to make a point-by-point rebuttal of the parties' arguments," *id.* at 2405. [17]

### 1.   *Nature and Circumstances of the Offense Under § 3553(a)(1)*

The nature and circumstances of defendants' crimes have been detailed in Parts I.A. and I.B.1 *supra*, and in prior decisions.  *See White I*, 116 F.3d at 909–910; *White-2019*, 413 F. Supp.

---

[17]       The D.C. Circuit acknowledged, before *Concepcion*, that "there is no requirement that sentencing courts expressly list or discuss every Section 3553(a) factor," but nonetheless stated that "'express acknowledgment of' the relevant factors and 'mitigation arguments is of course helpful and encouraged,' especially if there is no record of a hearing on the First Step Act motion for relief."  *Palmer*, 35 F.4th at 853 (quoting *United States v. Knight*, 824 F.3d 1105, 1110 (D.C. Cir. 2016), then *United States v. Pyles*, 862 F.3d 82, 94 (D.C. Cir. 2017)).  In this regard, to be crystal clear, certain factors enumerated in 18 U.S.C. § 3553(a) are ignored by the parties in their briefing, have limited relevance here, if any, and thus will not be addressed, including (1) the "need for the sentence imposed" to "provide the defendant with needed educational or vocational training, . . . or other correctional treatment in the most effective manner," *id.* § 3553(a)(2)(D); (2) "the kinds of sentences available," *id.* § 3553(a)(3); (3) "any pertinent policy statement" of the Sentencing Commission," *id.* § 3553(a)(5); and (4) "the need to provide restitution to any victims of the offense," *id.* § 3553(a)(7).

3d at 18–20, 52–53; *White II*, 984 F.3d at 82–85.  Defendants' offense conduct contributed

significantly to the organized flow of a highly addictive and dangerous drug to users across the

community and the level of violence occurring in their neighborhood in the area of First and

Thomas Streets, NW, as well as serious, adverse effects on the lives of the victims of that

violence and their families.  Moreover, the obstructive conduct in which they engaged was

designed to undermine the operation of the criminal justice system and prevent holding them and

others accountable for their crack distribution activities, as well as violent conduct, including

murders.  Notably, defendants were not convicted of any murder, but the sentencing judge who

presided over their trial and was able to assess the witnesses, certainly expressed the view that

defendants' obstruction tactics targeting potential witnesses contributed to "scared" witnesses,

some of whom "refused to give candid testimony when they finally did take the stand."  *White-*
*2019*, 413 F. Supp. 3d at 21 (quoting Sent'g Tr. (May 11, 1994) at 93:14–17).

  *White II* emphasized that both "judge-found and jury-found drug quantities" may be

"properly consider[ed] . . . as part of [the] exercise of discretion" under the First Step Act.  984

F.3d at 92.  Thus, attention to the large quantity of crack cocaine involved in defendants'

conspiracy is not only appropriate, but imperative, in weighing their requests for resentencing

relief.  The sentencing judge found a "conservative estimate" of the total quantity of crack

cocaine for which the conspiracy was responsible to be 21.87 kilograms, *White-2019*, 413 F.

Supp. 3d at 22, an amount almost 100 times greater than the quantity of crack cocaine required

today for the imposition of a life sentence.  *See* 21 U.S.C. 841(b)(1)(A)(iii).

  Turning to the specifics of the defendants' offense conduct, White was the maestro of the

First Street Crew, "a founding member of the organization" who "'orchestrat[ed]' the Crew's

illegal drug-trafficking and violent activities for the duration of the conspiracy."  Gov't White

Opp'n at 12 (quoting White PSR ¶ 18; *White I*, 116 F.3d at 909).  White's "control[] [of] much

of the distribution of crack" across the First Street neighborhood, White PSR ¶ 19, made him a

central figure in the flow of drugs through the area, and he "employed several juveniles to hold

and run drugs for him," *White I*, 116 F.3d at 909, while using "his own house to conduct First

Street Crew activities, including cooking, cutting, and packaging crack, as well as storing illegal

firearms and money from the organization's drug sales," Gov't's Opp'n at 13 (citing White PSR

¶ 24).

　　　In furtherance of the Crew's drug-running operation, White "was personally involved in

[] dangerous, violent, and harmful activities on behalf of the First Street Crew," *id.*, most notably

the "'brutal killing' of Arvell Williams," a witness cooperating with the government in the

defendants' prosecution, *White-2019*, 413 F. Supp. 3d at 52 (quoting Sent'g Tr. (May 11, 1994)

at 112:5).  Although the jury hung on whether White was guilty of Williams's murder, Judge

Greene, who presided over defendants' trial and sentencing, found "by clear and convincing

evidence that Mr. White was involved and guilty of the killing of Arvell Williams," stressing that

he had "heard nothing at the trial to deter [him] from that."  Sent'g Tr. (May 9, 1994) at 43:4–7.

White "engaged in violence against rival gangs and threatened to kill multiple people he believed

were stealing from the First Street Crew," Gov't's White Opp'n at 13 (citing White PSR ¶¶ 64 –

66), a threat made all the more real given his "possession of firearms on numerous occasions

during his leadership of the Crew," *id.* (citing White PSR ¶¶ 53–55).  On one such occasion,

White "and other Crew members chased a woman they believed had stolen from defendant's

crack cocaine stash, handcuffing her to a tree and beating her with a baseball bat."  *Id.* (citing

White PSR ¶ 63).  Beyond those violent acts, White obstructed justice and "showed extreme

disregard for the legal system, . . . warning one witness against cooperating with the government and urging another witness not to testify against him." *Id.* (citing White PSR ¶ 82). [18]

White's incarceration at various points in 1991 and 1992 did not derail the Crew's operations, thanks to Hicks, who took charge "whenever . . . White was in jail or otherwise occupied." *White-2019*, 413 F. Supp. 3d at 52 (quoting Sent'g Tr. (May 11, 1994) at 132:13–14). Before their eventual arrest, White and Hicks traveled together "to obtain large quantities of crack cocaine from one of White's suppliers," which they distributed to "street-level" sellers in the drug conspiracy. Hicks PSR ¶¶ 22–23. Hicks offered up his basement for the Crew to "cook[], cut, and package[] its crack together," recruiting his uncle to serve "as a cooker." *Id.* ¶ 23. As discussed above, Hicks made several attempts to thwart the government's investigation of the Crew, including by bribing Michael Jackson, another First Street Crew member who had received a grand jury subpoena, "not to disclose anything" to the grand jury "investigating White and Hicks's involvement in the murder of Gregory Jackson," *id.* ¶ 69, and "fleeing from law enforcement officers when they attempted to arrest him, by speeding at 80 miles per hour through several red lights and crashing into four cars during rush hour," *White-2019*, 413 F. Supp. 3d at 52. By the time of Hicks's arrest in 1992, he "was over 22 years old, and thus had been an adult for almost the entirety of the drug conspiracy's operation" over the previous five years. Gov't's Hicks Opp'n at 18. Hicks also had a prior felony conviction for Attempted Unauthorized Use of a Vehicle in a 1988 case in D.C. Superior Court, for which he was on

---

[18]    White was suspected of being involved in the murder of three other witnesses whom White believed were cooperating with the government.  White PSR ¶ 82.  Judge Greene observed that, although he did not take these murders "into account" since "none of that became part of" the trial record, "it is not farfetched to say that when you have a killing of an informer, a brutal killing of an informer," that "other killings or other intimidation was involved[,] particularly when some . . . witnesses came here obviously in fear and trembling."  Sent'g Tr. (May 11, 2019) at 112:1–9.

probation at the time he engaged in the instant offenses.  Hicks PSR ¶¶ 96, 98. [19]  The nature and circumstances of defendants' convictions demonstrate both the reasons for—and reasonableness of—the original sentences imposed and weigh strongly against significant, if any, alteration of the final judgments in this case.

### 2.    *History and Characteristics of the Defendants Under § 3553(a)(1)*

*White II* reviewed in some detail defendants' difficult childhoods and their activity while incarcerated, 984 F.3d at 91–92, indicating that "[w]hat they offered paints a very different picture than the portrayal of Appellants in the District Court's opinion," which "focused primarily on the crimes that Appellants committed almost 30 years ago," *id*. at 91.  Defendants elaborate in their supplemental briefing on what the D.C. Circuit characterized as "reasonable mitigation arguments."  *Id.*

Both men grew up in the Bloomingdale neighborhood of Washington, D.C., at a time when "whites and middle-class blacks had begun a precipitous exodus" from the area, and "Bloomingdale's zip code became home to the city's lowest median income."  White Mot. at 22; Hicks Mot. at 23–24.  White, whose mother was 15 years' old when he was born, was raised "in his maternal grandparents' home, the same environment in which his mother and her siblings experienced sexual abuse by their father and mental abuse by their mother."  White Mot. at 23.  By the time he was a teenager, both parents were incarcerated on drug charges.  *Id.*  Although he

---

[19]      Defendants quote selectively from Judge Greene's comments at sentencing, suggesting they make "abundantly clear that he thought very little of the mandatory system in place when [defendants] were sentenced" such that there is "strong evidence" that if he had "not been straightjacketed by the mandatory Guidelines and instead allowed to sentence [them] under the advisory Guidelines system as practiced today, . . . he would have varied below the range."  White Mot. at 20–21; Hicks Mot. at 21–22.  These arguments are "nothing more than wishful thinking," *Hicks*, 2021 WL 1634692, at \*9, both because convincing counterexamples show that Judge Greene found defendants' offenses presented egregious examples of drug kingpins, *see, e.g.*, Gov't's White Opp'n at 17–18 (citing excerpts from sentencing transcript); Gov't Hicks Opp'n at 17–18 (same), and because a court considering a First Step Act motion must avoid "engag[ing] in a counterfactual analysis of the course of action in the earlier proceeding," *United States v. Broadway*, 1 F.4th 1206, 1212 (10th Cir. 2021), a decision that defendants brought to the Court's attention, *see* White 1st Not. Suppl, Auth.; Hicks 1st Not. Suppl. Auth.

had been an honors student in junior high, *id.*, by the time he was 15 years old, he was involved in the First Street Crew selling crack cocaine, *id.* at 4, and stopped attending school regularly by 11th grade, *id.* at 23. White's involvement in the First Street Crew occurred between the age of 15 and his arrest at 20, and while he acknowledges that his "young age does not excuse or justify his serious conduct," *id.* at 27, he points to current social science research suggesting "that the maturation process . . . does not end at 18 years old, but instead, for males especially, continues well into one's late 20s," *id*. at 24, such that, at the time of his offense conduct he "was less able to exercise judgment and control impulses," *id.* at 27, than he is now as a "mature and thoughtful adult," *id.* at 28, and "markedly different person," *id.* at 27.

Hicks also faced substantial adversity as a young child, when at the age of five, he experienced the sudden and mysterious disappearance of his parents, who "got into a car one day and simply vanished," without him ever "learn[ing] what happened to them." Hicks Mot. at 25 (citing PSR ¶¶ 102–03). He was then raised by his grandmother, with whom he was close, but who "could not replace the sense of belonging, safety, and expectations that a parent can provide a young child." *Id.* By the age of 17, Hicks had graduated from Dunbar Senior High School, *id.*, but also gotten involved in selling and distributing crack in the First Street Crew, *id.* at 26. Like White, Hicks cites his youth over the course of the conspiracy, arguing that he "was less able to exercise judgment and control impulses," even though he also "had a greater capacity for reform." *Id.* at 28.

Defendants' childhoods and adolescences were plainly highly fraught. At the same time, as the government rightly notes, the "criminal activities underlying [the] convictions in this case were not the result of single impulsive act[s]" carried out by "rash juvenile[s]" acting in the heat of the moment. Gov't's Hicks Opp'n at 18. Instead, both defendants were "integral founding

member[s] of a large-scale drug trafficking conspiracy that distributed wholesale quantities of crack cocaine over the course of five years," controlling the flow of crack throughout their neighborhood.  *Id.*  The difficult circumstances of defendants' early years did not set them up for success, but neither did these circumstances compel their decisions to spend five years perpetuating a broad and violent crack trafficking conspiracy in their neighborhood that involved physically victimizing others and obstructing justice in the process.  Nonetheless, defendants' relative youth at the time of the conspiracy weighs slightly in favor of granting the requested relief.

### 3.  *Post-Sentencing Conduct Under § 3553(a)(1)*

As urged by the D.C. Circuit, special attention must be paid to defendants' "post-sentencing conduct," *White II*, 984 F.3d at 90, considering each defendant as he appears today, "not on the date of his offense or the date of his conviction," *Concepcion*, 142 S. Ct. at 2396. Supplementing the record on remand, White has submitted two of his own letters to the Court; six from family members; 21 from friends, co-defendants, and other people incarcerated with him; two from community leaders; and two letters reflecting job opportunities and community programs available to him were he to be released, as well as a "release plan."  *See* White Mot., Ex. 3 (White Ltrs. to the Court), ECF No. 736-4; *id.*, Ex. 4 (White Family & Friends Ltrs.), ECF No. 736-5; *id.*, Ex. 5 (White Employment Ltr.), ECF No. 736-6; White Reply, Ex. 6 (Clayvon Anderson Ltr. (Apr. 21, 2021)), ECF No. 747-1; *id.*, Ex. 7 (Eric Weaver Ltr. (May 5, 2021)), ECF No. 747-2; *id.*, Ex. 8 (White Ronald Hughes, Jr. Ltr. (Apr. 18, 2021)), ECF No. 747-3; *id.*, Ex. 9 (Ernest Smith Ltr. (undated)), ECF No. 747-4; *id.*, Ex. 10 (White Reentry Plan), ECF No. 747-5.

Hicks has submitted two of his own letters to the Court, as well as eight from family members; six from co-defendants or individuals incarcerated with him; two reflecting his

educational achievements and charitable efforts during his incarceration; two reflecting his experience with COVID-19 while incarcerated; one describing his Buddhist faith; three submissions describing a release plan if he were to be released; and two letters from charitable organizations thanking his non-profit organization for its support. *See* Hicks Mot., Ex. 1 (Hicks Ltrs. to the Court), ECF No. 731-2; *id.*, Ex. 2 (Debra Hicks Ltrs.); *id.*, Ex. 3 (Hicks Sons' Ltrs.); *id.*, Ex. 4 (Hicks Family & Friends Ltrs.); *id.*, Ex. 5 (Hicks Fellow Inmates Ltrs.); *id.*, Ex. 6 (Project D.A.D. Ltrs.); *id.*, Ex. 9 (Hicks Ltrs. regarding COVID-19); *id.*, Ex. 10 (Hicks Employment Ltrs.); Hicks Reply, Ex. 11 (Hicks Ltr. regarding Buddhism (Apr. 4., 2021)), ECF No. 746-1; *id.*, Ex. 12 (Sean Scott Ltr. (June 7, 2021)); *id.*, Ex. 13 (Hicks Ronald Hughes, Jr. Ltr. (Apr. 18, 2021)); *id.*, Ex. 14 (Evonne Hicks Ltr. (May 13, 2021)); *id.*, Ex. 15 (Hicks Reentry Plan). Each of these submissions has been reviewed and considered.

Remorse, and taking responsibility for prior criminal conduct, are crucial for a defendant seeking a sentence reduction, especially when no demonstrated acceptance of responsibility is readily apparent from, for example, entry of a guilty plea. White's first letter to the Court in connection with his pending motion, expressed no remorse and instead provided a litany of complaints about the unfairness of his sentence because his only convictions were for "distribution of cocaine base," as "a first time offender," and his sentence was increased due to application of "enhancements for uncharged and unproven conduct; in other words for unconvicted crimes," which he believes was "unconstitutional," White Ltr., dated April 30, 2019, at 1–2, prompting him to ask for modification of his sentence "minus the aggregated offenses based upon uncharged and unconvicted conduct," *id.* at 3. He declined to "profess that I am reform [sic] because I challenge the concept and question without an answer was I ever formed," citing his difficult upbringing. *Id*. at 2. White's second and more recent, though undated, letter

expressed remorse for himself for having "forfeited nearly 30 years of my life for the blasphemes and errors of my past."  White Ltr., undated, at 1.  He does, for the first time, state that he is "ashamed of the destructions that [he] had havocked, not just to [his] family and love[d] ones, but to those hurt by the violence then, to the community where [he] was raised and to the gamut of the city."  *Id.* at 1.  He reflects that he had an "underdeveloped sense of responsibility" and "did what [he] thought best to survive," as an explanation of his early infractions within BOP facilities, *id.*, but that today, he is "testament that experience carries a trait to mold one's disposition," and has devoted his life to work with and uplift youth, *id.* at 2.

Hicks expresses in his letters to the Court general regret for his actions and reflects on the circumstances that led him to make poor choices.  *See* Hicks Ltrs to the Court at 1 (March 4, 2019 Ltr.).  He accepts that his incarceration is "a direct result of the irresponsible and reckless decisions [he] made as a young man," and writes that despite everything that "has transpired in [his] life and in society in general[,] . . . the one thing that remains a constant is [his] continued mission to make amends for his actions as a young man," which he says is "the most sincere way that [he] know[s] to apologize to everyone who was affected by [his] actions."  *Id.* at 3 (Mar. 17, 2021 Ltr.).  He further discusses his adoption of a Buddhist practice, which has "helped [him] to overcome a stubbornness that persistently dogged [him] well into [his] 20s" and prevented him from "accepting advice that contradicted [his] way of thinking," especially the wisdom of his grandmother and elders.  Hicks Ltr. regarding Buddhism (Apr. 4, 2021) at 1.

As reflected in the letters submitted on their behalf, defendants have fostered strong bonds with their family and friends outside prison, an impressive achievement in light of their decades of incarceration, some of this time served more than a thousand miles away from Washington, D.C., *see* White Mot. at 29, and despite the past three years of increased isolation

and illness both inside and out of prison facilities due to the COVID-19 pandemic, *see* White Mot. at 36; Hicks Mot. at 31; Debra Hicks Ltrs. at 2 (Mar, 20, 2021 Ltr.); Hicks COVID-19 Ltrs. at 1–3; Hicks 3d Suppl. Supp. Section 404 Pleadings at 2.

White's fiancée Lucille Allen writes of the "vital role" he has played "in assisting in raising [her] son as a single mom" as well as his "support[] [of] anyone who is in need, and wholeheartedly." White Family & Friends Ltrs. at 1. His daughter Antonia White writes that even though she has "known him to be behind bars [her] entire life," he "is always there when times are hard" and that "[t]he confidence that [her] dad has for [her] makes [her] day." *Id.* at 3. Others describe the "enormous impression" White has made on others incarcerated with him, *see id.* at 7; Clayvon Anderson Ltr. at 2, and his "willingness to be productive in society," *see* White Family & Friends Ltrs. at 10.

Other letters submitted on White's behalf appear to minimize his conduct. White's co-defendant, Dan Hutchinson, Jr., writes that they "were never the Knucklehead, criminal lifestyle type of youngsters" and were "just caught up in that era." *Id*. at 3. A relative of White's describes him as having been "an upstanding member of the community" whose "encounter with the law was quite disheartening," *id.* at 12, while another describes having been "taken aback at the news of Antone having an encounter with the law" and expressing confidence that his years of drug dealing were "a one-time incident," *id.* at 14. Yet another friend describes White and Hicks as having been "locked up for 27 plus years for a non-violent crime" despite having been "model citizens." *Id.* at 30. Various friends and family have offered to support White financially and in finding employment were he to be released. *See id.* at 1, 21; Keith Wali Johnson Ltr. at 1; Eric Weaver Ltr. at 1; Ernest Smith Ltr. at 1; White Reentry Plan at 1; White Mot. at 37. Yet, that members of White's support network have turned him into some type of

hero, based on a revisionist portrayal of his past offense conduct, is troubling and raises concern about how much he has acknowledged his past criminal wrongdoing to family and friends.  In any event, White has apparently used his time in prison productively, obtaining his GED and completing "over 85 classes."  White Mot. at 28; *see also id.*, Ex. 1, White BOP Records, ECF No. 736-2; *id.*, Ex. 2, White Independent Study Classes, ECF No. 736-3.

As for Hicks, his wife writes that he "has grown much wiser" and "far more productive" and has "had successful achievements over the years," playing "an instrumental role in [her] life and the lives of [their] Sons."  Debra Hicks Ltrs. at 1 (Mar. 1, 2019 Ltr.).  His son Kavon Rayford writes that Hicks is "the most selfless and humble person" he has "ever seen" and that he "instilled accountability and responsibility in [his son] as a young man by his words and actions," as Hicks "never blamed anyone other than himself for the years that he has been away." Hicks Sons Ltrs. at 2; *see also* Hicks Family & Friends Ltrs. at 2 (Evonne Hicks Ltr. (Mar. 5, 2019)).  Others write of Hicks's high intelligence, and his efforts to further himself intellectually since his incarceration, Hicks Family & Friends Ltrs. at 2, 3, 4, including by completing a paralegal program via correspondence courses, *see* Hicks Mot., Ex. 7, Paralegal Certification at 2.  Notably, Hicks also helped found an organization at FCI Schuylkill, Project D.A.D., that for some period of time beginning in 2012, coordinated inmates collecting small donations for various community organizations, in order to "get accustomed to giving back to the communities and to illustrate to the people in the community that [they] care about the problems they endure." Project D.A.D. Ltrs. at 1; *see also id.* at 2, 4; Gov't's Hicks Opp'n at 19.

While completion of a professional paralegal certificate is a positive step towards constructive and law-abiding employment if released, aside from his paralegal certification and work with Project D.A.D, defendant's "programming record" is otherwise, as the government

notes, "sparse"—"averaging less than 2 courses and less than 5 hours of programming per year."
Gov't's Hicks Opp'n at 19.

As with White, individuals previously incarcerated with Hicks write of his "instrumental"
role in mentoring and tutoring them and "lead[ing] by personal example."  Hicks Fellow Inmates
Ltrs. at 1–2; Sean Scott Ltr. at 1.  His co-defendant Dan Hutchinson, Jr., writes that Hicks "has
navigated through his 25 years of incarceration with perseverance, patience, and hope," and "has
so much more to offer himself, his family, and the society."  Hicks Family & Friends Ltrs. at 1;
*see also* Hicks Ronald Hughes, Jr. Ltr. at 1 (writing that both men, "[i]f given a chance . . . will
not only seize the opportunity but flourish in rewriting their legacy").  Hicks has also prepared a
release plan.  *See* Hicks Reentry Plan; Hicks Mot. at 38–39; Hicks Employment Ltrs. at 1
(Demetria Atkinson Ltr. (Mar. 29, 2021)).

In addition to this mitigating evidence, *Concepcion* encourages courts, in "deciding
whether to grant First Step Act motions and in deciding how much to reduce sentences," to
"look[] to postsentencing evidence of violence or prison infractions as probative."  142 S. Ct. at
2403; *see also Pepper v. United States*, 562 U.S. 476, 491 (2011) ("[E]vidence of postsentencing
rehabilitation may be highly relevant to several of the § 3553(a) factors that Congress has
expressly instructed district courts to consider at sentencing.").  Hicks, to his credit, has very
positive things to report on this consideration.  His BOP file reports that he "maintains a positive
rapport with staff and inmates alike" and "actively participates in academic programs and
achieves good work performance evaluations."  Hicks Mot., Ex. 8, BOP Records at 3 (Progress
Report).  Over his decades of incarceration, Hicks has had only four disciplinary reports—from
1997, 1998, 2008, and 2009—encompassing five infractions, none of which involve violence or
the possession of contraband, and none at all since 2009, when defendant was cited for "charging

fees for legal work while assigned to [the] law library clerk." BOP Records at 9. BOP classifies him as a minimal risk of recidivism. *See* Hicks 1st Suppl. Supp. Section 404 Pleadings, Ex. 16, Updated Inmate Profile at 1, ECF No. 753-1.

White's record tells a different story: over the past decades and as recently as 2015, he "has been sanctioned for 24 incidents," encompassing "a total of 29 separate infractions," six of which "involved violent conduct, 3 involved dangerous weapons, 1 involved a threat to commit violence, and 3 involved the possession of illegal drugs," with eight separate infractions qualifying as 100-level infractions, which is "BOP's highest disciplinary severity level." Gov't's White Opp'n at 19; *see also* White BOP Records at 12–18. White attempts to frame as positive the fact that he "has had only two disciplinary incidents, both non-violent, since his participation in what is known as the Special Management Unit (SMU)," a "behavior modification program for inmates who 'present unique security and management concerns,'" White Mot. at 32 (quoting BOP, *Special Management Units*, Program Statement 5217.02 (Aug. 9, 2016)), but the government's concern is well-founded that even "[a]fter spending more than two decades in prison," completing the SMU program, and "reaching his 40s," on two *separate* occasions White has been "sanctioned for possessing heroin," Gov't's Opp'n at 19. As the Court concluded previously, "White's time in prison provides troubling evidence that he has not remediated." *White-2019*, 413 F. Supp. 3d at 52. Nevertheless, the D.C. Circuit found White's prison record to be more benign than in this Court's view. *White II*, 984 F.3d at 91 (noting that "[t]he District Court opinion found notable that White's disciplinary record included violent infractions," but "[e]qually notable, in our view, is the fact that Appellant has incurred no violent infractions in the past ten years").

Taking together the evidence before the Court of defendants' post-sentencing behavior, the letters submitted to the Court on behalf of both defendants demonstrate the positive impact they have on those incarcerated with them and their families, and the other indicia of defendants' educational, mentoring, and philanthropic accomplishments suggest that they have figured out a way to contribute constructively to their communities and wish to continue to do so if released to the community through reduction of their sentences. In considering the defendants' prison records, however, some daylight emerges between them: Hicks's largely exemplary behavior weighs strongly in his favor, while White's repeated violent infractions, and the disciplinary actions taken against him for possession of heroin as recently as in 2015, counterbalance other evidence of his rehabilitation. [20]

### 4. *Need to Avoid Unwarranted Sentencing Disparities Under § 3553(a)(6)*

Among the § 3553(a) factors is consideration of whether relief may be warranted to avoid unwarranted sentencing disparities due to relief granted to "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In addressing this factor, the FSA and First Step Act have effectively tasked each federal district judge with the function akin to that previously performed by the Parole Commission, but without the robust data collection and comprehensive analytical tools available to that agency or even the U.S.

---

[20] White and Hicks also argue that "[t]he continued risks to [them] in prison and the more punitive nature of the past year[s]" of the COVID-19 pandemic "further support a time served sentence." White Mot. at 37 (citing 18 U.S.C. § 3553(a)(2)(D) which urges a court to consider "the need for the sentence imposed to . . . provide the defendant with needed . . . medical care . . . in the most effective manner"); Hicks Mot. at 38 (same). The widespread availability of vaccines to protect against serious illness from infection with COVID-19, both generally and at USP Florence and FCI Schuylkill, where White and Hicks are housed respectively, *see* BOP, *COVID-19 Vaccine Implementation* (last visited Aug. 24, 2022), https://www.bop.gov/coronavirus/, render this argument less weighty, as "[t]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot justify . . . release," *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also Hicks*, 2021 WL 1634692, at *6 (finding the ongoing COVID-19 pandemic was not an "extraordinary and compelling circumstance" justifying Hicks's release because several factors "substantially diminishe[d] his risks from potential exposure to COVID-19," including that he was set to "soon receive his second dose" of the vaccine and had already recovered from a COVID-19 infection).

Sentencing Commission.  For example, while the U.S. Sentencing Commission has stepped up to provide data regarding sentence reductions across the country under the First Step Act, that effort is limited to information submitted to the Commission and covers only sentence reduction motions granted, not those denied, and so is necessarily skewed.  U.S. SENT'G COMM'N: FIRST STEP ACT OF 2018 RESENTENCING PROVISIONS RETROACTIVITY DATA REPORT at Introduction (May 2021) ("USSC FIRST STEP ACT REPORT") (stating that the "report represents information concerning motions for a reduced sentence pursuant to Section 404 of the First Step Act which the courts have granted . . . through September 30, 2020 and for which court documentation was received, coded, and edited at the Commission by May 3, 2021"). [21]  Nevertheless, the § 3553(a)(6) factor must be considered, *see White II*, 984 F.3d at 90–91 ("we think it is especially important that the District Court consider the section 3553(a) sentencing factors when passing on a motion for relief under section 404"), using the best available information and arguments presented by the parties.

To support their request to reduce their sentences to time served, *see* White Reply at 23; Hicks Reply at 24, defendants raise three primary arguments, none of which is particularly helpful at identifying those defendants most similarly situated to White and Hicks.  They first point to cases where such relief has been granted based on the defendant's "age today, the length of time he has served, his mitigating evidence, his strong rehabilitation, and his family and community support," Hicks Reply at 10; White Reply at 10, but those cases only highlight several factors wholly missing from the record before this Court about White and Hicks. [22]  For

---

[21]     The USSC FIRST STEP ACT REPORT is available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/retroactivity-analyses/first-step-act/20210519-First-Step-Act-Retro.pdf.

[22]     White and Hicks also point to three cases in which defendants' crack conspiracy sentences were reduced from life to roughly 25 years—an incarceration period defendants here have already served.  *See* White Reply at 8–11 (citing *United States v. Warren*, No. 95-cr-147 (ICB), 2020 WL 3036011 (S.D. W.Va. June 5, 2020); *United States v. Jones*, No. 3:99-CR-264-6 (VAB), 2019 WL 4933578 (D. Conn. Oct. 7, 2019); *United States v. VanBuren*, No. 00-cr-66 (NKM), 2019 WL 3082725 (W.D. Va. July 15, 2019)); Hicks Reply at 8–11 (citing same).  These

example, defendants rely on four cases in which the movant submitted letters or reports supporting the sentence reduction from BOP personnel praising their rehabilitation. *See* Hicks Reply at 8–10, 15 (citing *United States v. Mothersill*, 421 F. Supp. 3d 1313 (N.D. Fla. 2019); *Hall v. United States*, No. 93-cr-162 (RAJ), 2020 U.S. Dist. LEXIS 121742 (E.D. Va. Mar. 2, 2020); *United States v. Black*, No. 94-cr-15 (LWF), 2021 WL 297573 (E.D.N.C. Jan. 28, 2021); *United States v. Cotton*, No. 00-cr-60029 (RGJ), 2021 WL 1390403 (W.D. La. Apr. 21, 2021)); White Reply at 8–10 (same). [23]  No such letters from BOP officials with direct, extended interactions with defendants—which go far in assuaging a court that the person seeking relief is truly rehabilitated—have been submitted here.  The "General Comment[]" in Hicks's BOP Records that he "maintains a positive rapport with staff and inmates alike" and receives "good work performance evaluations," Hicks BOP Records at 3, is positive, but holds substantially less weight than the letter submissions by BOP officials that were part of the record in the cases cited by defendants.

As further support for their argument in favor of reducing their sentences to time served, defendants next cite the USSC FIRST STEP ACT REPORT issued in May 2021, reporting that "a full 28.3 percent of Section 404 grants have resulted in sentences below the [Guidelines] range." White Reply at 8 (citing USSC FIRST STEP ACT REPORT Table 5); Hicks Reply at 7 (citing same).

---

cases are distinguishable, variously, for the drug quantity found by the sentencing judge to be attributable to the defendant, who had "not committed any serious infractions since his incarceration" (*Warren*, 2020 WL 3036011, at *3); for the defendant's robust education record and near-perfect disciplinary record (*Jones*, 2019 WL 4933578, at *17); and for the absence of any specific allegations that defendant had committed violent acts in furtherance of the conspiracy (*VanBuren*, 2019 WL 3082725, at *6).

[23]      Defendants also cite *United States v. Bowman*, No. 92-cr-392 (LAP), 2020 WL 470284 (S.D.N.Y. Jan. 29, 2020).  *See* White Reply at 9; Hicks Reply at 8.  Although in that case no letters were submitted by BOP officials on defendant's behalf, the court noted, in granting defendant's request to reduce his sentence to time served, that he had been "productively employed while in prison . . . as a Suicide Watch Companion for the prison psychology department," which program "has rigorous criteria for acceptance and requires . . . annual training" and for which he had "received a special monetary award for 'an act which protects the lives of employees or inmates, or the property of the United States.'"  *Bowman*, 2020 WL 470284, at *2.  Like a recommendation from a BOP official, this specialized work history, and the award he received for it, amounts to strong evidence of rehabilitation.

Two flaws are apparent in this reasoning.  First, defendants gloss over the most significant aspect of the statistic cited, namely, that 71.7%—or the great majority—of the reduced sentences granted under the First Step Act have been at or above the Guidelines range, which even under current Guidelines would call for a sentence roughly ten years longer than defendants have now served.  Thus, this statistic does little to bolster defendants' request for a reduction to a below-Guidelines sentence of time served.  Second, as already noted, the USSC FIRST STEP ACT REPORT is already skewed to reflect only those sentence reduction motions granted and does not include or take account of the percentage of motions that have been denied.  USSC FIRST STEP ACT REPORT at Introduction n.7.

Finally, defendants also compare their sentences to those imposed on their three co-defendants, all of whom have completed their sentences and been released from incarceration.  *See* White Reply at 16–17; Hicks Reply at 17–18.  As summarized *supra* at n.3, Ballard-Bey was released from prison in September 2003, after serving 9 years; Hutchinson was released from prison in September 2008, after serving 14 years; and Hughes was released from prison in May 2019, after serving over 25 years' imprisonment.  *White-2019*, 413 F. Supp. 3d at 28.  All five men were members of the First Street Crew and active participants in the drug trafficking conspiracy.  The disparities between the three co-defendants' sentences and White and Hicks's life sentences are warranted, however, by the differences in the defendants' roles within the organization.  White and Hicks "founded and controlled the drug trafficking organization" in early 1988, Hicks PSR ¶ 17, first joined by "neighborhood friends" including Hutchinson, and two years later, in 1990, by others including Ballard-Bey and Hughes, *id.* ¶ 20.  Thus, while White and Hicks were the "leader[s] of the Crew . . . accountable for all drugs distributed by members of the organization throughout the conspiracy," *id.* ¶¶ 75–76, the other co-defendants,

to varying degrees, bear less responsibility.  Hutchinson, while "an original member of the Crew and an active participant in the drug conspiracy," primarily acted as a "street-level drug seller," who took crack distributed to him by White and Hicks and resold it to customers "on the street and from stash houses."  *Id.* ¶ 77.  Ballard-Bey was also "a street-level seller" who "did not join the group until the summer of 1990" and was therefore held "accountable only for a *pro rata* portion of the drugs sold" across the conspiracy, of 10.94 kilograms.  *Id.* ¶ 79.  Hughes, the final co-defendant, was "considered to be Antone White's 'right hand man'" and "directly involved in the murder of Arvell Williams."  *Id.* ¶ 78.  As a later arrival to the Crew, however, who acted as a street-level seller, he was only responsible for the *pro rata* 10.94-kg amount of crack cocaine. *Id.*  Each of these defendants thus played a lesser role in perpetuating the Crew's illegal operations than White and Hicks, and the disparities in their sentences are therefore not "unwarranted."  18 U.S.C. § 3553(a)(6).

One approach that may be more illuminating is to examine sentencing data under current Guidelines for defendants convicted of crack cocaine or just powder cocaine offenses with, as here, total offense levels of 43, whether due to the quantity of drugs involved in the offense conduct or application of aggravating enhancements for leadership role and obstruction.  The U.S. Sentencing Commission makes available online the Judiciary Sentencing Information ("JSIN") platform that provides cumulative data based on five years of sentencing data for offenders sentenced under the same primary guideline, and with the same Final Offense Level and Criminal History Category selected.  Unfortunately, an insufficient number of either crack or powder cocaine defendants, at the lowest criminal history category, with a total offense level of 42 or 43, comparable to these defendants, were available in the last five fiscal years (FY2017–

2021), after excluding offenders who received § 5K1.1 substantial assistance departures, to report any relevant statistics.

Surveying reported cases is somewhat more helpful, even if not possibly exhaustive. Looking to other defendants convicted of crack and RICO conspiracy offenses in this district, the cases of defendants Kevin Williams-Davis and McKinley Board, leaders of the R Street Crew, an eight-year, "multi-million dollar drug operation" in northeast Washington, D.C, who were recently granted resentencing relief by another Judge on this Court, are notable. *See* White 2d Not. Suppl. Auth. at 1 (citing *United States v. Williams-Davis*, No. 91-cr-559-1 (TFH); *United States v. Board*, No. 91-cr-559-11 (TFH)); Hicks 2d Not. Suppl. Auth. at 1 (same). Both defendants had been convicted of various drug conspiracy offenses, and Williams-Davis was further convicted of two counts of second degree murder while armed, in violation of D.C. Code § 22-2403, but paroled for those offenses in 2005. [24] Resentencing Tr. (Sept. 13, 2021) ("Williams-Davis Resentencing Tr.") at 17:7–12, *United States v. Williams-Davis*, No. 91-cr-559-1 (TFH), ECF No. 2379. Based on the record of each defendant's post-sentencing conduct and other mitigating factors, Judge Hogan found the approximately 30 years each defendant had served was sufficient punishment for their offenses, and reduced their life sentences to time served. *See* Order for Sentence Reduction, *United States v. Williams-Davis*, No. 91-cr-559-1, ECF No. 2376; Order for Sentence Reduction, *United States v. Board*, No. 91-cr-559-11, ECF No. 2344. These defendants' records bear important differences from those of White and Hicks, including because Williams-Davis's motion for First Step Act relief was accompanied by a

---

[24] Williams-Davis is thus the rare defendant eligible for First Step Act relief despite being convicted of murder. The First Step Act did not alter the penalty ranges for homicide offenses, and so defendants serving sentences for murder and other federal homicide offenses are generally ineligible for relief due to the presence of non-"covered offenses." *See United States v. Sumler*, No. 95-cr-154-2 (BAH), 2021 WL 6134594, at *26 (Dec. 28, 2021) (finding defendant ineligible for relief under First Step Act due to his "conviction for an offense not covered by Section 404(b) of the First Step Act, namely Count 6 (CCE murder)," for which he was serving a life sentence).

personal recommendation for release from an official at FCC Petersburg who called Williams-Davis "the most modeled and exceptional inmate" he had "encountered," which praise from BOP officials, as discussed previously, is given substantial weight by a court.  *See* Def.'s Mot. Reduce His Sentence Pursuant to the First Step Act of 2018, Ex. 13, Ltr. from Arkell R. Graves, *United States v. Kevin Williams-Davis*, No. 91-cr-559-1, ECF No. 2365-13.  Moreover, defendant McKinley Board was found to have been "one of [the] lieutenants in the Crew," rather than "one of the top two or three" leaders, placing him in a different category than Williams-Davis, as well as White and Hicks, who steered the operations of the First Street Crew across its five-year existence.  Resentencing Tr. (Oct. 21, 2020) at 25:8–16, *United States v. Board*, No 91-cr-559 (TFH), ECF No. 2346.  Yet, the scale of Williams-Davis's and Board's conspiracy; the parallel allegations of violence and murder (in Williams-Davis's case, proven beyond a reasonable doubt); and the defendants' roles at or near the top of their trafficking organization do situate them in a similar position to White, and even more so to Hicks, whose behavioral record while incarcerated closely aligns with theirs.  *See id.* at 26:12 (noting Board had had "two infractions in 22 years"); Williams-Davis Resentencing Tr. at 10:2–8 (finding it "notable" that during Williams-Davis's time in prison, he had "not been accused or been reprimanded or disciplined at all for anything coming close to violence or anger or insubordination"). [25]

Looking outside this district, other courts have granted First Step Act sentence reduction motions within the new statutory penalty range for defendants who played key roles in crack cocaine trafficking conspiracies involving large quantities of drugs, including where defendants

---

[25] One of the only other First Step Act cases involving crack conspiracy convictions in this district, *United States v. Smith*, was decided before *White II*, and relief was denied based on the actual quantity of crack cocaine at issue in the conviction.  No. 09-cr-237 (RCL), 2020 WL 5816496, at *3 (Sept. 30, 2020).  While the Judge noted that no relief would have been granted even if defendant had been eligible, due to the "magnitude of [the] original crimes" and the defendant's lengthy criminal history, the sentence that defendant was serving was substantially shorter—156 months—than the life sentences at issue here.  *Id.* at *9.

used violence or obstructed justice in furtherance of the conspiracy, where those defendants have conducted themselves in an exemplary manner in the intervening decades.  In *United States v. Odom*, for example, the court reduced the life sentence to a term of 30 years for a defendant convicted of crack conspiracy who had headed a criminal organization that "distributed vast amounts of narcotics" from Los Angeles to Louisiana and "committed acts of violence against" and threatened his co-conspirators "when they attempted to leave the conspiracy."  No. 00-cr-50050 (RGJ), 2020 WL 1905294, at *1, *6 (W.D. La. Apr. 17, 2020).  The court cited the defendant's post-conviction "work as an orderly in a medium security facility" where he "consistently earned average or above average work evaluations" and had only a single "disciplinary event while in BOP custody."  *Id.* (internal quotations omitted).  *See also United States v. McKinney*, No. 06-cr-20078 (JWL), 2022 WL 1136189, at *5 (D. Kan. Apr. 18, 2022) (reducing sentence for one count of crack distribution and one firearms offense to top of current Guidelines range, but no further, given "the significant quantity of drugs attributed to [defendant]," his "aggravated assault in connection with a drug transaction" and the reports by "multiple witnesses" of pretrial "threats communicated to them by individuals associated with [him]"); *Jones v. United States*, 431 F. Supp. 3d 740, 752–54 (E.D. Va. 2020) (reducing aggregate sentence to 25 years for defendant convicted for his "leadership role" in "a long-running crack cocaine distribution conspiracy," where there was "no evidence that [he] engaged in or directed any gun violence in furtherance of the conspiracy" and had only "relatively minor" violations while incarcerated and was "not considered a management problem").

Indeed, courts have granted this relief even where defendants were alleged to have been involved in, but not convicted of, murder, when their post-sentencing conduct demonstrated rehabilitation.  For example, in *Brown v. United States*, the life sentence of a defendant convicted

of conspiring to traffic heroin and crack and powder cocaine, in violation of 21 U.S.C. §§ 841 &

841(b)(1)(A), and use of a firearm during a drug trafficking crime, in violation of 18 U.S.C.

§ 924(c), was reduced to an aggregate term of 40 years.  No. 00-cr-100 (ELH), 2020 WL

1248950, at *1, *10 (D. Md. Mar. 16, 2020).  Despite "clear and convincing evidence" that

defendant had been implicated in a "cold-blooded murder," *id.* at *9, though not convicted for

this murder, the court found "a total sentence of 40 years" to be "sufficient but not greater than

necessary to accomplish the objectives of sentencing," pointing to defendant's demonstrations of

remorse, his positive behavioral record while incarcerated, and unit manager evaluations

describing him as an "exceptional worker" and "professional and courteous at all times," *id.* at

*10.  *See also United States v. Cheese*, No. 98-cr-259 (ELH), 2020 WL 3618987, at *1, *9–*10

(D. Md. July 2, 2020) (reducing defendant's life sentence for drug conspiracy offense to term of

28 years, despite allegations that defendant had "personally ordered the killing of suspected

informants," where defendant had "received positive performance evaluations from BOP

supervisors for his work through UNICOR" and "expressed remorse for his conduct"); *United

States v. Hill*, No. 96-cr-399 (JKB), 2020 WL 2089379, at *1–*2 (D. Md. Apr. 30, 2020)

(reducing defendant's sentence for one count of crack conspiracy and two counts of distribution

to 27 years on the basis of his "excellent" post sentencing conduct and "strong performance

reviews from his supervisors," despite finding the offense conduct was "unquestionably serious

by virtue of the violence and quantity of drugs associated with the conspiracy," and the evidence

that defendant's co-conspirator had committed a murder "that was foreseeable to Defendant");

*Babb v. United States*, No. 04-cr-190 (ELH), 2021 WL 2315459, at *18–*20 (D. Md. June 4,

2021) (granting relief to defendant serving life sentence for role in a "conspiracy that distributed

significant quantities of cocaine and crack cocaine" and "involved violence, including two

murders," and reducing aggregate sentence to 30 years' imprisonment as defendant had been "a model prisoner," "not incurred any disciplinary infractions," and "received numerous positive performance evaluations").

Given that the sentence recommended under today's Guidelines would be capped at 40 years for both White and Hicks, *see* Part III.B. *supra*, reducing their sentences within the new Guidelines range is warranted, and would adequately address, with the imperfect data available, the § 3553(a)(6) factor.

*          *          *

In ruling on a motion for resentencing relief under the First Step Act, "[a]ll that is required is for a district court to demonstrate that it has considered the arguments before it." *Concepcion*, 142 S. Ct. at 2405. Considering, *inter alia*, that (1) the categorical approach to applying the First Step Act to determine eligibility for a sentence reduction does not necessitate granting a motion for such relief, but is probative of the statutory maximum applicable based only on the jury-found quantity of drugs, and, here, the new post-FSA statutory (and also the Guidelines' sentencing range) maximum would be 40 years, rather than life imprisonment, regardless of the aggravating factors of leadership role, use of firearms, and obstruction, which drive the sentencing range higher than the statutory maximum; (2) the need to "take account of Congress's intent to rectify disproportionate and racially disparate sentencing penalties," *White II*, 984 F.3d at 81, weighs heavily in accounting for the new statutory and Guidelines sentencing range maxima of 40 years' imprisonment that would apply, post-FSA, to defendants; (3) the egregious nature and circumstances of defendants' offense conduct of leading a crack distribution crew for multiple years that was responsible, conservatively, for distributing over 21 kilograms of crack cocaine, using violence, including murder, to protect their operations,

compounded by obstruction of justice to avoid being held accountable for their criminal conduct; (4) their history and characteristics, including their difficult childhoods highlighted by the D.C. Circuit, *see White II*, 984 F.3d at 91–92, but which this Court simply does not find sufficient to excuse or counterbalance the aggravating circumstances of their offense conduct; (5) their activities while incarcerated and the relationships they have formed and maintained during that time, which indicate a rehabilitated attitude towards the community in which they live; and (6) the need to avoid unwarranted sentencing disparities, when other defendants who have been sentenced to life imprisonment, without a murder conviction, have had sentence reduction motions granted, the Court concludes that on balance these factors weigh in favor of reducing defendants' life sentences to terms of years.

Beginning with White, the reduced maximum penalties available by statute and the capped Guidelines range both weigh in favor of reducing White's sentence here, as does his criminal history score of I, White PSR ¶ 101; all of the educational programming he has completed while incarcerated; and the relief granted to other defendants serving life sentences for leadership roles in crack conspiracies.  At the same time, the actual quantity of drugs involved in the conspiracy; White's role as "kingpin" and violent acts, including the "clear and convincing evidence" of his involvement in the Williams murder; his efforts to obstruct justice by threatening witnesses who came to court "trembling," *see* n.17 *supra*; and his troubling behavioral record while incarcerated of "24 incidents" encompassing "29 separate infractions," including for "violent conduct," Gov't's White Opp'n at 19, lead the Court to conclude that reducing White's sentence any further than 35 years would not "reflect the seriousness of the offense[s]" or "promote respect for the law," 18 U.S.C. § 3553(a)(2)(A).  White's sentence is therefore reduced to 35 years.

Turning to Hicks, the reduced maximum penalties available by statute; the capped Guidelines range; and the relief granted to other defendants serving life sentences for leadership roles in crack conspiracies, also weigh in favor of reducing Hicks's sentence, as does his nearly unblemished post-sentencing conduct; and the lack of "clear and convincing" findings by the sentencing judge of any direct involvement in the Williams murder or any others.  At the same time, Hicks's attempts to interfere with the grand jury investigating the Crew; attempts to flee arrest, thereby putting others in danger; and his otherwise obstructive conduct targeting witnesses and the investigative process, weigh against granting him the relief he requests of time-served, as does the actual quantity of drugs his Crew trafficked; and his position of power and control at the top of the organization.  In light of the differences in their post-sentencing conduct, the Court finds reducing Hicks's sentence slightly more than White's sentence—to 33 years—appropriately reflects the differences in how each defendant has grown and been reformed in the decades since their convictions. [26]

---

[26]   Defendants' request for a hearing, *see* White Mot. at 37–38; Hicks Mot. at 39, is denied.  "[N]o categorical right to allocute applies to motions to reduce a sentence under the First Step Act."  *Lawrence*, 1 F.4th at 42.  While *White II* counsels that defendants "be given full and fair hearings on their claims to ensure that the goals of the Act are met," 984 F.3d at 81, as defendants concede, *see* Hicks Reply at 28–29; White Reply at 28–29, *White II* does not require that the Court hold a "telephonic or video hearing," Hicks Mot. at 39; *see* Gov't's Hicks Opp'n at 20 ("Although *White II* noted the absence of a hearing on defendant's initial First Step Act motion, it did so only in the context of identifying an alternative source—beyond this Court's written opinion—that could have potentially demonstrated that the Court did indeed consider all of the relevant factors identified by the D.C. Circuit." (citation omitted)).  "Nothing in the text or structure of Section 404, however, categorically requires that district courts provide an opportunity for the defendant to allocute before ruling on such a motion."  *Lawrence*, 1 F.4th at 47; *see also Palmer*, 35 F. 4th at 853 (finding no error in district court's decision not to hold a hearing on defendant's First Step Act motion); *Concepcion*, 142 S. Ct. at 2404 ("All that the First Step Act requires is that a district court make clear that it reasoned through the parties' arguments" (internal alterations and quotations omitted)); *see also* FED. R. CRIM. P. 43(b)(4) (a defendant "need not be present" for a proceeding [that] involves the correction or reduction of a sentence under . . . 18 U.S.C. § 3582(c)").  Given the extensive review and discussion set forth herein of the parties' arguments and evidence, as set forth in more than four hundred pages of briefing and exhibits, no hearing is necessary.  *Cf. Sumler*, 2021 WL 6134594, at *7 (where hearing requested by defendant was held and "undercut, rather than helped demonstrate, that defendant had accepted full responsibility for his offense conduct and thereby raised questions about his claim that he had been fully rehabilitated and was ready for reentry into the community with the appropriate respect for and willingness to comply with the law.").

**IV.     CONCLUSION**

For the reasons set forth above, defendants' supplemental motions for relief under the

First Step Act, ECF Nos. 731 & 736, are **GRANTED IN PART** and **DENIED IN PART**.  The

sentence imposed on Antone White for his conviction on Count 1 is reduced to 35 years, and the

sentence imposed for his convictions on Counts 5 and 18 is reduced to time served.  The

sentence imposed on Eric Hicks for his conviction on Count 1 is reduced to 33 years and

sentence imposed for his conviction on Count 5 is reduced to time served.  Defendants' motions

are otherwise denied.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: August 24, 2022

_____
BERYL A. HOWELL
Chief Judge